**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BAYER CROPSCIENCE LLC, MONSANTO COMPANY, and MONSANTO TECHNOLOGY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MODERNA, INC., MODERNA US, INC., and MODERNATX, INC.,<br><br>Defendants. | ) | C.A. No. 26-cv-0012-WCB<br><br>**JURY TRIAL DEMANDED** |

**MODERNA'S COUNTERCLAIMS, ANSWER, AND AFFIRMATIVE DEFENSES TO THE COMPLAINT**

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendants/Counterclaim-Plaintiffs Moderna, Inc., Moderna US, Inc. ("Moderna US"), and ModernaTX, Inc. ("ModernaTX," and collectively with Moderna, Inc., and Moderna US, "Moderna" or "Defendants"), by and through their undersigned counsel, assert the following Counterclaims against Plaintiffs/Counterclaim-Defendants Bayer CropScience LLC, Monsanto Company, and Monsanto Technology LLC (collectively, "Monsanto-Bayer" or "Plaintiffs"). Moderna also responds to Monsanto-Bayer's Complaint for Patent Infringement (the "Complaint") as set forth below.

**COUNTERCLAIMS**

1. Monsanto-Bayer asks this Court to transform a nearly four-decade-old crop-science disclosure into a claim over one of the most significant breakthroughs in modern medicine: mRNA vaccines. The asserted patent, U.S. Patent No. 7,741,118 (the "'118 Patent") (D.I. 1-1), is strictly focused on genetic modifications for plant crops, and is appropriately titled "Synthetic Plant Genes and Method for Preparation." The patent describes the work of Monsanto agricultural scientists

who sought to modify plant DNA to make plants express foreign (i.e., non-plant) proteins—specifically, insecticidal proteins that would make crops toxic to plant-eating insects. *Every* example in the patent concerns modifying DNA in plant cells. The patent says *nothing* about application to human cells or human DNA, let alone human mRNA, human therapeutics, or mRNA vaccines.

2. The face of the patent claims a priority date of 1989. The only reason the patent has not yet expired is because it spent a decade in interference proceedings over who first invented the method claimed in the '118 Patent. The Patent Office and Monsanto-Bayer repeatedly characterized, including in sworn declarations, that alleged invention as methods of modifying insecticidal-protein-expressing DNA sequences to improve expression of those proteins in plants. The patent issued in 2010. The '118 Patent lay dormant and unasserted for sixteen years after issuance.

3. In the decades following Monsanto-Bayer's work on making insect-resistant plants, the world saw decades of innovation and technological advances in the field of genetic modification, including the birth of new fields undreamed of in 1989, such as mRNA vaccine technology for human disease. One of those revolutionary innovations was Moderna's unprecedented work to develop an mRNA vaccine for COVID-19. That work has been heralded not only for its extraordinary human impact during the global pandemic but also for its groundbreaking science. Moderna's COVID-19 vaccine arose from Moderna's innovations in modifying messenger RNA (mRNA)—not DNA. Moderna's COVID-19 vaccine uses mRNA that encodes an engineered variant of the SARS-CoV-2 spike protein found on the outer surface of the SARS-CoV-2 virus that causes COVID-19. The vaccine uses mRNA to drive expression of a modified version of a portion of the virus's spike protein, thereby providing an antigen to train the body to recognize and

destroy the markers of the disease-causing virus. Moderna's own research and innovation powered that mRNA technology; to claim that Monsanto's 1989 work on plant DNA played any role in that innovation would require ignoring the limited plant-DNA-focused scope of Monsanto's work and the decades of scientific development in the separate field of human mRNA technology.

4. Sixteen years after the '118 Patent issued and 37 years after the alleged invention date, Monsanto-Bayer seeks to exploit its claims to extract a windfall from the success of Moderna's work. Just shy of six years after Moderna designed the sequence for its COVID-19 vaccine, Monsanto-Bayer filed this lawsuit trying to claim its 1989 work gave it a right to exclude Moderna from using the methods *Moderna* developed to create its revolutionary mRNA human vaccines.

5. Moderna seeks declarations of noninfringement and invalidity and, based on the extraordinary nature of Monsanto-Bayer's assertion of the '118 Patent, an award of its attorneys' fees under 35 U.S.C. § 285. Moderna further seeks a declaration that Monsanto-Bayer has no claim against Moderna for any accused use or manufacture of Moderna's COVID-19 vaccine that was for the United States Government and with its authorization or consent under Moderna's government contracts.

## I. THE ASSERTED CLAIMS AROSE FROM CROP GENETIC ENGINEERING TECHNOLOGY AND CLAIM A SPECIFIC SEQUENCE-MODIFICATION METHOD

6. The '118 Patent is titled "Synthetic Plant Genes and Method for Preparation." It issued on June 22, 2010 and claims priority to an application filed on February 24, 1989. The patent arose from work in agricultural biotechnology addressing a particular problem: bacterial genes that produced useful proteins in bacteria did not always produce those proteins effectively when the genes were introduced into plants. The inventors sought to improve expression in plants by altering the DNA coding sequences of those bacterial genes.

7. The patent focuses on genes derived from the bacterium *Bacillus thuringiensis* ("B.t.") that encode proteins toxic to certain insects. The inventors noted that prior researchers had linked certain DNA sequence motifs to the instability of mRNA produced in cells, and noted that unstable mRNA would lead to reduced expression of the protein encoded by that mRNA. The inventors acknowledged that they did not discover the relationship between these sequence motifs and mRNA instability. To the contrary, the patent specification acknowledges that earlier research by Shaw and Kamen (published in 1986) had already identified certain DNA sequences—such as "ATTTA"—as destabilizing sequences in mammalian cells. '118 Patent at 1:53–2:20. The patent likewise attributes the identification of potential destabilizing polyadenylation signal sequences to earlier published research by Wickens and Stephenson (1984) and Dean et al. (1986). *See id.* at 2:55–3:18. The inventors acknowledged that the knowledge gap or problem to which *their* work was directed was limited to specific application of the role of these sequences in plants. They noted "[n]o analysis of the function of this sequence in plants has been done," and the disclosure that follows is limited to analyzing whether the prior insights from research in mammalian cells extended also to plant cells. *See id.* at 1:55–62. Put simply, the inventors' asserted contribution was not the discovery of those sequences or their potential biological effects, but their role in expression of DNA introduced into plants. Indeed, every working example in the patent concerns that plant-focused application.

8. Despite the patent's narrow, plant-based scope, Monsanto-Bayer asserts its claims should be read to cover Moderna's work. Monsanto-Bayer's Complaint identifies four claims: independent claim 59 and dependent claims 60, 73, and 79. Unlike practically all of the other 109 claims, those four claims are the only ones that do not expressly recite a plant, plant cell, plant promoter, or insecticidal protein. Monsanto-Bayer's infringement claim relies entirely on the

absence of express plant-based limitations in those claims. It asks the Court to read into that absence an entirely different invention contorted to reach Moderna's mRNA vaccines. Everything about the patent and its history prohibits that manipulation. Even without an express plant-based limitation, a person of ordinary skill in the art would understand the asserted claims relate to the same invention described by the patent specification and the other 109 claims, which is limited to methods in plants.

9. Even if the asserted claims were read to reach beyond plants to human applications, they would still require the specific substitution-based method described in the patent. The claimed method requires starting with an existing DNA sequence encoding a protein, identifying destabilizing sequences of the type previously described in mammalian-cell literature, and replacing codons within that sequence with sense codons to reduce their presence and encode the same protein. The patent itself distinguishes this substitution approach from constructing a synthetic sequence through de novo synthesis. Claim 59, the only asserted independent claim, recites:

> A method of making a structural gene that encodes a protein, the method comprising:
>
> > (a) starting with a coding sequence that encodes a protein and that contains polyadenylation signal sequences listed in Table II;
> >
> > (b) reducing the number of said polyadenylation signal sequences in the coding sequence ***by substituting*** sense codons for codons in the coding sequence; and
> >
> > (c) making a structural gene that comprises a coding sequence that includes the codons substituted according to step (b) and is characterized by the reduced number of Table II polyadenylation signal sequences, and that encodes the protein.

Thus, the asserted claims require starting with a coding sequence that already contains the identified sequences and reducing them by substituting codons within that sequence. As set forth

below, Moderna does not use that method, and Monsanto-Bayer's own conduct before this lawsuit confirms that it never regarded the patent as anything other than an improvement in crop genetic engineering technology.

## II. MODERNA INDEPENDENTLY DEVELOPED AND USES A DIFFERENT mRNA SEQUENCE-DESIGN PROCESS

10. Moderna was founded in 2010 to develop a new class of medicines based on messenger RNA, or "mRNA." Long before SARS-CoV-2 emerged, Moderna had invested billions of dollars and nearly a decade of sustained effort in building an integrated mRNA platform—including proprietary technologies for designing mRNA coding sequences, chemically modifying mRNA, delivering mRNA in vivo into patients, improving manufacturing processes, and developing therapeutics and vaccines directed to particular diseases. These investments, undertaken at a time when many in the scientific community questioned whether mRNA technology would ever prove effective, led to fundamental breakthroughs spanning the full spectrum of mRNA medicines: from the design of the mRNA molecule itself to the technologies needed to deliver it safely and effectively to patients. The Complaint does not allege that Monsanto-Bayer performed any work in developing human mRNA medicines, and Moderna is aware of no successful mRNA vaccine or therapeutic that Monsanto-Bayer has produced.

11. By the beginning of the COVID-19 pandemic, Moderna had already developed mRNA-vaccine capabilities and pursued vaccines against multiple infectious diseases, including cytomegalovirus, Zika, respiratory syncytial virus, influenza, human metapneumovirus, and parainfluenza virus. Moderna had six mRNA candidates for infectious diseases in clinical trials before SARS-CoV-2 emerged. In 2015, Moderna scientists developed an mRNA vaccine for the Middle East Respiratory Syndrome ("MERS") coronavirus, demonstrating that mRNA encoding a full-length coronavirus spike protein in a lipid nanoparticle could successfully prevent

coronavirus infection. When the outbreak struck, Moderna had fewer than 1,000 employees—most of whom worked in research and development—and pivoting the company's priorities to COVID-19 required diverting resources from other projects and accepting substantial risk in doing so. Moderna was positioned to respond rapidly to SARS-CoV-2 because of technologies developed through its own independent research—not Monsanto-Bayer's decades-old work on expressing bacterial genes in plants.

12. As part of Moderna's work, it developed its own proprietary mRNA sequence-design platform. Moderna developed automated tools and algorithms for designing mRNA molecules *de novo*, driven by design criteria that have nothing to do with the substitution method claimed in the '118 Patent. When SARS-CoV-2 sequences became available in January 2020, Moderna used the tools it spent years developing to finalize the mRNA-1273 coding sequence within days.

13. Moderna's state-of-the-art sequence-design process bears no resemblance to the substitution method Moderna is accused of infringing.

14. There is also a more fundamental reason why Moderna would have no cause to target Monsanto-Bayer's so-called "Problem Sequences" for removal. The plant-expression concern described in the '118 Patent has no application to Moderna's manufacturing process. The Complaint does not explain how Table II sequences would function in Moderna's *in vitro* manufacturing process or why Moderna would target them for removal. Moderna does not do so.

15. The asserted claims are directed to a method. Yet nothing in the Complaint sets forth the method that Moderna allegedly used. The Complaint does not allege that Moderna started with a native viral coding sequence, identified the specified sequences within it, or substituted codons within that sequence to reduce them. Nor does it allege that the final Moderna sequence encodes the same protein as the viral nucleotide sequence. Instead, the Complaint relies on a backward-

looking comparison between naturally occurring viral nucleotide sequences and Moderna's finished coding sequences. From the observation that the finished sequences allegedly contain fewer of certain motifs, Monsanto-Bayer assumes that Moderna began with the native sequences and reduced those motifs through codon substitution. But a comparison of finished sequences does not establish the process by which Moderna's sequences were designed. It does not establish that Moderna began with the native sequences, targeted the identified motifs for reduction, or performed the substitution steps required by the claims. Monsanto-Bayer nevertheless filed suit apparently without investigating whether Moderna performed the claimed method, even though publicly available materials described Moderna's mRNA platform as employing rapid computational design, automated synthesis, and cell-free in vitro transcription. Those disclosures are inconsistent with Monsanto-Bayer's assumption that Moderna began with the native viral coding sequences identified in the Complaint and modified them through the substitution method claimed in the '118 Patent.

16. Following the declaration of a public health emergency, Moderna entered into numerous agreements with the U.S. Government regarding its COVID-19 vaccine. In April 2020, Moderna entered into a grant agreement with the Biomedical Advanced Research and Development Authority ("BARDA")—an office of the Department of Health and Human Services—to support clinical development of the mRNA-1273 vaccine (Contract No. 75A50120C00034, the "BARDA Contract"). BARDA chose to partner with Moderna to develop that vaccine because Moderna's mRNA-based vaccine platform had been used to rapidly prepare vaccine candidates against other infectious diseases.

17. Thereafter, Moderna entered a series of advance purchase and supply agreements with the U.S. Government for supply of COVID-19 vaccines. For example, on April 16, 2020, Moderna

entered into the BARDA Contract with the U.S. Department of Health & Human Services, which required Moderna to develop an mRNA vaccine to licensure for the prevention of COVID-19, including pre-clinical and Phase II and Phase III clinical studies sufficient to demonstrate the safety and efficacy of the proposed vaccine. The BARDA Contract incorporated by reference FAR 52.227-1, entitled "Authorization and Consent," and provided that "[o]wnership and applicable usage rights of all materials/product (e.g. vaccines, validated lots) manufactured and/or acquired with Government funds, throughout the Contract's entire period of performance, shall be retained by the USG." Once Moderna had obtained promising clinical results, on August 9, 2020, ModernaTX, Inc. entered into the DoD Supply Contract with the Army Contracting Command of the U.S. Department of Defense (Contract No. W911QY20C0100). Under the DoD Supply Contract, Moderna was obligated to produce and deliver doses of its COVID-19 vaccine to the U.S. Government, with the option to supply additional doses. The DoD Supply Contract specifically states that Moderna manufactured vaccine doses "for the United States Government." The DoD Supply Contract also incorporates by reference FAR 52.227-1, entitled "Authorization and Consent," and FAR 52.246-16, entitled "Responsibility for Supplies," under which "[t]itle to supplies furnished under this contract shall pass to the Government upon formal acceptance, regardless of when or where the Government takes physical possession, unless the contract specifically provides for earlier passage of title."

18. Pursuant to these contracts, including the DoD Supply Contract, Moderna manufactured COVID-19 vaccine for, and sold COVID-19 vaccine doses to, the U.S. Government. Moderna received emergency use authorization for its COVID-19 vaccine in the United States from the Food & Drug Administration on December 16, 2020, less than a year after beginning development. Promptly thereafter, Moderna shipped vaccine doses to the U.S. Government pursuant to those

contracts. The U.S. Government took title to the vaccine doses manufactured under the DoD Supply Contract and controlled their distribution.

## III. MONSANTO-BAYER'S CONDUCT PRIOR TO THIS LAWSUIT BELIES ITS PRESENT CLAIM THAT ITS WORK WAS FOUNDATIONAL TO mRNA VACCINES

19. Moderna developed its mRNA platform and the accused vaccines through its own sustained investment, research, clinical development, and manufacturing efforts. Monsanto-Bayer and its work played no role in that effort. Nor did Monsanto-Bayer publicly claim during Moderna's years of platform development that Moderna's achievements depended on Monsanto's decades-old agricultural work. That Monsanto-Bayer now characterizes its plant-focused patent as foundational to mRNA-vaccine technology is contradicted by Monsanto-Bayer's own sworn representations to the Patent Office, its prosecution conduct, and its commercial experience—each of which confirms that, until this lawsuit, everyone involved understood the '118 Patent as limited to plant biotechnology.

20. Throughout years of prosecution, the interference proceedings, and prior disputes involving related patents, Monsanto-Bayer's predecessors and the inventors presented the purported invention in exclusively plant-focused terms. The interference counts that defined the invention for purposes of the priority dispute were themselves expressly directed to plant expression. And in a sworn declaration submitted to overcome the Patent Office's written-description objections, Monsanto's own expert described the broadest reach of the invention as extending to "expressing essentially any non-plant genes *in plant cells*," and characterized the inventors' core discovery as finding "that coding sequence base composition, particularly the presence of (A+T)-rich regions, limits expression *in plants*." *See* Declaration of James A. Baum, Ph.D., *In re Patent Application of: David A. Fischoff et al.*, Docket No. 28079/41785 (Aug. 14, 2008), at ¶¶ 3.2, 3.6 (emphasis added). As far as Moderna is aware, at no point during prosecution

did *anyone* associated with the patent suggest that the claimed methods had any application to mRNA vaccines, human therapeutics, or the design of coding sequences for expression in mammalian cells.

21. Monsanto-Bayer's commercial experience confirms the point. If the '118 Patent were truly foundational to mRNA-vaccine technology, one would expect Monsanto-Bayer's own mRNA efforts to have reflected that advantage. They did not. In January 2021, Bayer AG partnered with CureVac on CVnCoV, CureVac's first-generation mRNA COVID-19 vaccine candidate, agreeing to assist with regulatory affairs, clinical operations, supply-chain activities, and commercialization. That vaccine failed to obtain regulatory approval, and the collaboration ended without a commercialized product. Monsanto-Bayer did not identify the '118 Patent or its claimed method as foundational or even useful to that effort.

22. Monsanto-Bayer also did not assert the '118 Patent against Moderna when the patent issued in 2010, when Moderna developed and launched its first commercial product in 2020, or during the years following that launch. Instead, the '118 Patent remained unasserted against Moderna for approximately *sixteen years* after issuance while Moderna invested billions of dollars in developing and commercializing its mRNA technology. Monsanto-Bayer now invokes the patent, as it approaches the end of its asserted term, to seek payment based on the success of vaccines it did not invent, develop, or help bring to patients.

23. In short, Monsanto-Bayer's prelitigation conduct is irreconcilable with its present attempt to portray the '118 Patent as foundational to Moderna's mRNA vaccines. That attempt is a litigation-driven construct, unsupported by the patent's specification, contradicted by the sworn representations Monsanto-Bayer made to the Patent Office and the courts, and belied by Monsanto-Bayer's own failed mRNA efforts and sixteen years of silence. The '118 Patent

concerns plant-focused work that Monsanto-Bayer has now attempted to stretch to cover independently developed human medicines through an infringement theory that vitiates the method steps its own claims require. Those circumstances support Moderna's request for declarations of noninfringement and invalidity and, together with Monsanto-Bayer's baseless infringement allegations, an award of attorneys' fees under 35 U.S.C. § 285.

## PARTIES

24. Counterclaim-Plaintiff Moderna, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 325 Binney Street, Cambridge, Massachusetts 02142.

25. Counterclaim-Plaintiff Moderna US, Inc. ("Moderna US") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 5 Vaughn Drive, Princeton, New Jersey, 08540. Moderna US is a wholly owned subsidiary of Moderna, Inc.

26. Counterclaim-Plaintiff ModernaTX, Inc. ("ModernaTX") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 325 Binney Street, Cambridge, Massachusetts 02142. ModernaTX is a wholly owned subsidiary of Moderna, Inc.

27. Upon information and belief, Counterclaim-Defendant Bayer CropScience LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 800 N. Lindbergh Boulevard, Creve Coeur, Missouri 63141.

28. Upon information and belief, Counterclaim-Defendant Monsanto Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 800 N. Lindbergh Boulevard, Creve Coeur, Missouri 63141.

29. Upon information and belief, Counterclaim-Defendant Monsanto Technology LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 800 N. Lindbergh Boulevard, Creve Coeur, Missouri 63141.

30. Counterclaim-Defendants purport to hold rights in the '118 Patent sufficient to assert the claims alleged in the Complaint.

## JURISDICTION AND VENUE

31. These Counterclaims arise under the patent laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. This Court has subject-matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

32. This Court has personal jurisdiction over each Counterclaim-Defendant because each has consented to the Court's jurisdiction by joining in the Complaint and asserting claims against Moderna in this District.

33. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391, including because Counterclaim-Defendants commenced this action in this District.

34. An actual, immediate, and justiciable controversy exists between Moderna and Monsanto-Bayer concerning whether Moderna infringes the '118 Patent, whether the asserted claims are valid, and whether Monsanto-Bayer has any claim against Moderna for accused conduct protected by 28 U.S.C. § 1498.

## COUNT I

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '118 PATENT

35. Moderna repeats and incorporates by reference the allegations of Paragraphs 1 through 34 as though fully set forth herein.

36. Monsanto-Bayer has accused Moderna of infringing claims 59, 60, 73, and 79 of the '118 Patent[1] through certain of Moderna's mRNA vaccines. D.I. 1, ¶¶ 66–81. A real, immediate, and justiciable controversy therefore exists between Moderna and Monsanto-Bayer concerning Moderna's alleged infringement of claims 59, 60, 73, and 79 of the '118 Patent.

37. Moderna has not infringed and does not infringe, directly or indirectly, willfully or otherwise, either literally or under the doctrine of equivalents, claims 59, 60, 73, and 79 of the '118 Patent.

38. To the extent that Monsanto-Bayer accuses Moderna of infringing claims of the '118 Patent other than claims 59, 60, 73, and 79, a real, immediate, and justiciable controversy also exists between Moderna and Monsanto-Bayer concerning Moderna's alleged infringement of those claims, as Moderna has not infringed and does not infringe, directly or indirectly, willfully or otherwise, either literally or under the doctrine of equivalents, any valid claim of the '118 Patent.

39. For example, Moderna does not practice the method required by independent claim 59. Moderna does not start with the native viral coding sequences identified by Monsanto-Bayer and reduce specified sequences "by substituting sense codons for codons in the coding sequence." '118 Patent at Claim 59. Claims 60, 73, and 79 likewise are not infringed because each either depends directly or indirectly from claim 59 and requires the method recited therein—which Moderna does not practice—or itself depends on claims with express limitations directed to plants that are not implicated by Moderna's human mRNA vaccines.

---

[1] *See also* D.I. 27 (Monsanto-Bayer's Answering Br. in Opp'n to Moderna's Mot. to Dismiss the Compl. for Failure to State a Claim) at 1 n.1 ("Bayer's Complaint specifically alleges infringement for claims 59-60, 73, and 79 of the '118 Patent (the 'Asserted Claims').").

40. Moderna is entitled to a declaratory judgment that it has not infringed and does not infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid asserted claim of the ’118 Patent.

**COUNT II**

**DECLARATORY JUDGMENT OF INVALIDITY OF THE ’118 PATENT**

41. Moderna repeats and incorporates by reference the allegations of Paragraphs 1 through 40 as though fully set forth herein.

42. Monsanto-Bayer has asserted claims 59, 60, 73, and 79 of the ’118 Patent against Moderna. A real, immediate, and justiciable controversy therefore exists between Moderna and Monsanto-Bayer concerning the validity of those claims.

43. Claims 59, 60, 73, and 79 of the ’118 Patent are invalid for failure to comply with one or more of the statutory requirements of Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and 112, and other applicable requirements for patentability and validity, including those recognized under 35 U.S.C. § 282.

44. To the extent that Monsanto-Bayer asserts claims of the ’118 Patent other than claims 59, 60, 73, and 79, a real, immediate, and justiciable controversy also exists between Moderna and Monsanto-Bayer concerning the validity of those claims, which are likewise invalid for the reasons set forth herein.

45. For example, to the extent Monsanto-Bayer construes the asserted claims to encompass any process that results in a reduction of the identified sequence motifs—regardless of how that result is achieved—the claims are directed to a naturally occurring relationship between those motifs and gene expression or RNA stability, combined with the abstract instruction to reduce the motifs. Claims so construed lack any meaningful limitation on the method by which the result is accomplished and are directed to patent-ineligible subject matter under 35 U.S.C. § 101.

46. The asserted claims also are anticipated or would have been obvious under 35 U.S.C. §§ 102 and 103. To the extent the claims encompass any decrease in the identified motifs, including the reduction of a single motif through codon selection or substitution, the asserted subject matter was disclosed or rendered obvious by pre-priority knowledge concerning codon substitution, codon usage and optimization, avoidance of sequence motifs, sequence features affecting gene expression and RNA stability, and synthetic-gene design. Indeed, the '118 Patent's own specification confirms that the identified sequences and their potential effects on RNA stability were already known from earlier published research. The inventors did not independently discover those relationships; they simply purport to apply those relationships to a plant-specific application (and then allege that the patent is not limited to such plant-specific applications).

47. The asserted claims further lack adequate written-description and enabling support under 35 U.S.C. § 112 to the extent Monsanto-Bayer construes them to encompass host-agnostic sequence design, mammalian mRNA medicines, human vaccines, or the full range of processes its infringement theory would reach. The specification discloses only plant-focused methods and examples. That disclosure does not demonstrate that the inventors possessed—or enable a person of ordinary skill to practice—the vastly broader invention Monsanto-Bayer now claims.

48. Moderna is entitled to a declaratory judgment that claims 59, 60, 73, and 79, and any other asserted claim, of the '118 Patent are invalid.

## <u>COUNT III</u>

## DECLARATORY JUDGMENT OF IMMUNITY UNDER 28 U.S.C. § 1498

49. Moderna repeats and incorporates by reference the allegations of Paragraphs 1 through 48 as though fully set forth herein.

50. Under 28 U.S.C. § 1498(a), Monsanto-Bayer has no claim against Moderna as to any use or manufacture of doses of Moderna's COVID-19 vaccine that were made "for the Government"

and "with the authorization or consent of the Government" pursuant to the BARDA Contract and the DoD Supply Contract.

51. Based on Monsanto-Bayer's Complaint, Moderna understands that Monsanto-Bayer disputes that it has no claim against Moderna to the extent that, pursuant to Moderna's contracts with the U.S. Government, certain use or manufacture of Moderna's COVID-19 vaccine was done for the U.S. Government and with the authorization or consent of the U.S. Government.

52. By virtue of the above facts, an actual controversy has arisen and now exists between Moderna and Monsanto-Bayer as to whether Monsanto-Bayer has a claim against Moderna to the extent that, pursuant to Moderna's contracts with the U.S. Government, certain use or manufacture of Moderna's COVID-19 vaccine was done for the U.S. Government and with the authorization or consent of the U.S. Government.

53. Moderna requests a judicial determination that Monsanto-Bayer has no claim against Moderna to the extent that, pursuant to Moderna's contracts with the U.S. Government, certain use or manufacture of Moderna's COVID-19 vaccine was done for the U.S. Government and with the authorization or consent of the U.S. Government. Such a declaratory judgment is necessary and appropriate at this time in order to determine the rights and legal relations of the parties, pursuant to 28 U.S.C. § 2201.

## ATTORNEYS' FEES

54. Monsanto-Bayer's assertion of the '118 Patent against Moderna's independently developed mRNA technology, including under the baseless infringement theory alleged in the Complaint, renders this an exceptional case entitling Moderna to an award of its reasonable attorneys' fees under 35 U.S.C. § 285.

## PRAYER FOR RELIEF ON COUNTERCLAIMS

WHEREFORE, Moderna respectfully requests that the Court enter judgment in its favor and against Monsanto-Bayer as follows:

(a) Declaring that Moderna has not infringed, and does not infringe, directly or indirectly, literally or under the doctrine of equivalents, any valid asserted claim of the ’118 Patent, including at least Claims 59, 60, 73, and 79;

(b) Declaring that each asserted claim of the ’118 Patent, including at least Claims 59, 60, 73, and 79, is invalid;

(c) Dismissing Monsanto-Bayer’s Complaint with prejudice and denying each and every prayer for relief contained therein;

(d) Declaring that Monsanto-Bayer has no claim against Moderna to the extent that, pursuant to Moderna’s contracts with the U.S. Government, any accused conduct was done for the U.S. Government and with the authorization or consent of the U.S. Government;

(e) Declaring this case exceptional under 35 U.S.C. § 285 and awarding Moderna its reasonable attorneys’ fees, costs, and expenses incurred in this action; and

(f) Awarding Moderna such other and further relief as the Court deems just and proper.

## JURY DEMAND ON COUNTERCLAIMS

Moderna hereby demands a trial by jury on all issues so triable on its Counterclaims.

* * *

## ANSWER

Defendants Moderna, Inc., Moderna US, Inc., and ModernaTX, Inc. (collectively, “Moderna” or “Defendants”), by and through their undersigned counsel, answer the allegations in the Complaint as follows. Moderna uses the Complaint’s headings solely for convenience and does not admit or adopt any allegation or characterization contained in those headings. To the

extent any heading or other unnumbered text in the Complaint is deemed to contain an allegation requiring a response, Moderna denies that allegation. Unless expressly admitted, Moderna denies each allegation in the Complaint.

Monsanto-Bayer uses the term "Problem Sequences" to refer collectively to certain sequences identified in the '118 Patent. That term is Monsanto-Bayer's litigation-created characterization, not terminology used in the asserted claims or adopted by Moderna. Moderna's use of that term in responding to the Complaint, if any, refers solely to Monsanto-Bayer's allegations and does not constitute an admission concerning the nature, function, or significance of any sequence.

In addition, throughout the Complaint, Plaintiffs selectively excerpt, reorder, and combine quotations drawn from the Asserted Patent, various Moderna publications, regulatory filings, prior litigation filings, and other materials produced in different contexts and for different purposes. To the extent Moderna admits that particular quoted language appears in a given source, that admission is limited to the accuracy of the quotation itself. Moderna does not admit the composite narrative, juxtaposition, or implication that Plaintiffs construct by assembling those quotations, and Moderna denies any characterization, inference, or conclusion that Plaintiffs seek to draw from the arrangement or combination of such excerpts.

Moderna reserves the right to amend or supplement its Answer, Affirmative Defenses, and Counterclaims as permitted by the Federal Rules of Civil Procedure, the Local Rules of this Court, and any applicable scheduling order, including after Monsanto-Bayer identifies its asserted claims and infringement theories with the specificity required in this action.[2]

[2] In reproducing the allegations of the Complaint below, Moderna has omitted footnotes appearing in the original Complaint as they contain no allegations relevant to the Complaint. Their omission does not constitute an admission that the references cited exist, are properly cited, or support the

## INTRODUCTION

1. The COVID-19 pandemic resulted in more than 7 million deaths worldwide, including 1.2 million in the United States, and triggered a severe economic crisis that caused more than 20 million U.S. job losses at its peak. The Trump Administration's Operation Warp Speed, a landmark venture by the federal government and leading vaccine manufacturers to safely and swiftly bring COVID-19 vaccines to market, was a major achievement that hastened the end of the global pandemic and saved millions of lives.

**ANSWER NO. 1:** Moderna admits that the COVID-19 pandemic caused millions of deaths worldwide and severe economic disruption, including substantial job losses in the United States. Moderna further admits that Operation Warp Speed was an initiative of the federal government involving vaccine manufacturers, including Moderna, to accelerate the development and availability of COVID-19 vaccines. Moderna otherwise denies the remaining allegations of Paragraph 1.

2. The success of Moderna's vaccine was made possible in part by the company's infringement of Plaintiffs' intellectual property ("IP"), developed in the 1980s and for which patent protection was filed in 1989, to eliminate "problem" coding sequences in the building blocks of cells to improve mRNA stability and the amount or quality of protein produced. Two federal courts (including this one) and the U.S Patent Office have confirmed Plaintiffs' critical technology was the first of its kind to be developed, with the patent ultimately being issued by the United

---

proposition for which they are offered. Moreover, Moderna does not make any admission with respect to the contents of those references, which are not properly incorporated into the Complaint by their mere citation in a footnote.

States Patent and Trademark Office in 2010. Across U.S. industries, cutting-edge solutions to complex challenges are grounded in innovation from the world's top researchers and scientists. Taking legal steps to safeguard those innovations is a common business practice for many technology-based companies like Plaintiffs, as protecting IP rights is critical to continued scientific advancements that solve longstanding problems, especially given the significant cost and time required. Without IP protection, innovation would diminish, leaving fewer options to address today's constantly-evolving global challenges and improve life for Americans and people around the world.

**ANSWER NO. 2:** Moderna denies that the success of its COVID-19 vaccine was made possible, in whole or in part, by infringement of any intellectual property belonging to Plaintiffs. Moderna admits that the application that led to U.S. Patent No. 7,741,118 (the "'118 Patent") purports to claim priority to an application filed in 1989 and that the United States Patent and Trademark Office issued the '118 Patent in 2010. Moderna denies that any court or the United States Patent and Trademark Office has confirmed that the methods claimed in the '118 Patent constitute "critical technology" used by Moderna or were the "first of [their] kind." To the extent Plaintiffs rely on the priority or interference proceedings involving the '118 Patent, those proceedings concerned the particular plant-focused invention defined by the interference counts and did not establish that Drs. Fischhoff and Perlak invented sequence optimization, discovered the nucleotide sequences at issue or their relationship to mRNA stability, or developed technology generally applicable to mRNA vaccines or any other field beyond the plant-expression systems addressed in those proceedings. The remaining allegations of Paragraph 2 consist of legal conclusions, characterizations, and generalized statements regarding innovation and intellectual-property

protection to which no response is required. To the extent a response is required, Moderna denies the remaining allegations of Paragraph 2.

3. Plaintiffs' innovation was originally used to make plants resistant to insect pests, improving agricultural output and reducing need for pesticide sprays through the increased expression of an insect-resistant protein in crop plants. As Moderna has noted, mRNA instability leading to poor protein expression was the main roadblock they faced in developing an effective COVID vaccine. Moderna used Plaintiffs' patented method to enhance its vaccines' mRNA stability and thus the vaccines' ability to confer immunity to the virus. Moderna used Plaintiffs' discovery to make its COVID-19 vaccines without Plaintiffs' permission; Plaintiffs did not have any affiliation with the vaccines' manufacturer regarding the vaccines or any involvement in the development of the vaccines.

**ANSWER NO. 3:** Moderna admits that the '118 Patent includes claims reciting methods relating to the expression of insecticidal proteins in plants. Moderna further admits that Plaintiffs had no affiliation with Moderna concerning Moderna's COVID-19 vaccines and played no role in their development. Moderna denies that it used any method claimed in the '118 Patent, with or without Plaintiffs' permission, to develop or manufacture its COVID-19 vaccines. Moderna further denies that any alleged use of Plaintiffs' technology enhanced the stability of Moderna's mRNA or its vaccines' ability to confer immunity. Moderna otherwise denies the allegations of Paragraph 3.

4. Plaintiffs do not seek to interfere with Moderna's ongoing efforts with respect to COVID or Moderna's creation of vaccines for myriad other illnesses. By the same token, Moderna has profited handsomely from infringing vaccine sales worldwide. The patent system provides an important, predictable framework for advancing

scientific knowledge by allowing companies a limited period to recover at least a reasonable royalty for the unauthorized use of their patented inventions. Indeed, over the past several years, many companies and research institutions alleging that their technologies were used in the development of the vaccine have sued Moderna, asking to obtain fair compensation for the use of their IP. Now, Plaintiffs are alleging the same and are asking for the basic compensation afforded to a patent holder under the patent statute.

**ANSWER NO. 4:** Moderna admits that Plaintiffs do not seek injunctive relief. Moderna further admits that other entities have filed lawsuits alleging that Moderna infringed their intellectual property in connection with Moderna's COVID-19 vaccines. Moderna denies that it has infringed any valid claim of the '118 Patent or profited from any such infringement. The remaining allegations of Paragraph 4 consist of legal conclusions, characterizations of this action and other litigation, and generalized statements concerning the patent system to which no response is required. To the extent a response is required, Moderna denies the remaining allegations of Paragraph 4.

## NATURE OF THE ACTION

5. This patent infringement action arises under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, seeking damages for Moderna's infringement of Plaintiffs' U.S. Patent 7,741,118 (the "'118 Patent"), a copy of which is attached as **Exhibit A**. As stated in the Abstract, the '118 Patent discloses "method[s] for modifying structural gene sequences to enhance the expression of the protein product."

**ANSWER NO. 5:** Moderna admits that the Complaint purports to assert an action for patent infringement arising under the patent laws of the United States and seeks damages for alleged infringement of the '118 Patent. Moderna further admits that a purported copy of the '118 Patent

is attached to the Complaint as Exhibit A and that the Abstract of the ’118 Patent contains the quoted language. The ’118 Patent and its prosecution history speak for themselves. Moderna denies that it has infringed any valid claim of the ’118 Patent and otherwise denies the allegations of Paragraph 5.

> 6. In the 1980s, researchers for Plaintiffs, Dr. David Fischhoff (“Fischhoff”) and Dr. Fred Perlak (“Perlak”) (collectively, “Plaintiffs’ Scientists”), dedicated significant efforts towards advancements in making plants resistant to insects and viruses, increasing crop yields, and reducing need for pesticide sprays. While working to express proteins of bacterial and viral origin in plants to confer insect and virus resistance, Drs. Fischhoff and Perlak discovered that certain genes from bacteria and viruses were replete with specified problem sequences that they conceived contributed to mRNA instability, leading to poor protein expression in higher organisms. Fischhoff and Perlak linked these problem sequences to mRNA instability in animal and plant cells alike, and discovered that making genes that encode a desired protein with fewer (or none) of the problem sequences dramatically increased protein expression and related bioactivity. The ’118 Patent includes a teaching that its basic method may be used “to express [a] viral coat protein at an effective level” and thereby “achieve virus resistance” in eukaryotic cells and includes an illustrative example of such use.

**ANSWER NO. 6:** Moderna lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning the efforts or work of Drs. Fischhoff and Perlak and therefore denies those allegations. Moderna admits that the ’118 Patent includes material concerning the expression of certain proteins in plants, including insecticidal proteins and viral coat proteins.

Moderna further admits that the '118 Patent discusses certain sequences that prior researchers had identified or studied as possible polyadenylation signals or mRNA-instability sequences. Moderna denies that Drs. Fischhoff and Perlak discovered those sequences or first linked them to mRNA instability in animal and plant cells. Indeed, the '118 Patent itself attributes the ATTTA sequence as a destabilizing motif in mammalian mRNA to the work of Shaw and Kamen and attributes the identification of putative polyadenylation signal sequences to earlier research by Wickens and Stephenson and Dean et al. *See* '118 Patent at 1:58–61 ("The sequence motif ATTTA . . . has been implicated as a destabilizing sequence in mammalian cell mRNA (Shaw and Kamen, 1986)"); *id.* at 2:64–3:1 ("[I]n plant cells there seems to be an extended range of functional sequences (Wickens and Stephenson, 1984; Dean et al., 1986)"); *see also* Shaw & Kamen, *Cell* 46:659–667 (1986); Dean et al., *Nucleic Acids Research* 14:2229–2240 (1986); Wickens & Stephenson, *Science* 226:1045 (1984). The '118 Patent and its prosecution history speak for themselves. Moderna otherwise denies the allegations of Paragraph 6.

7. Based upon this research, the '118 Patent claims the inventions of Drs. Fischhoff and Perlak of methods for making a structural gene by reducing specified destabilizing sequences and substituting sense codons in their place. The '118 Patent identifies the destabilizing sequences as including, for example, putative plant and animal polyadenylation signal sequences listed in Table II ("Table II Sequences"), ATTTA sequences, and regions with over five consecutive A and/or T nucleotides (collectively, "Problem Sequences"). While Drs. Fischhoff and Perlak were not working on these gene modifications specifically for use in mRNA vaccines, their methods to improve protein production and mRNA stability

represented an important discovery that benefits applications in other industries beyond agriculture, including pharmaceuticals.

**ANSWER NO. 7:** Moderna admits that the '118 Patent names Drs. Fischhoff and Perlak as inventors and includes claims reciting methods of making a structural gene by reducing the occurrence of specified nucleotide sequences through the substitution of sense codons. Moderna further admits that certain claims refer to sequences listed in Table II, ATTTA sequences, and regions containing more than five consecutive adenine or thymine nucleotides. Moderna denies that Drs. Fischhoff and Perlak discovered those sequences or their potential biological effects, which the '118 Patent attributes to earlier published research. Moderna further denies that the methods claimed in the '118 Patent constitute an important discovery applicable to Moderna's mRNA vaccines or other pharmaceutical products, or that Moderna has used any such claimed method. The '118 Patent and its prosecution history speak for themselves. Moderna otherwise denies the allegations of Paragraph 7.

8. Moderna used the claimed method of the '118 Patent in the development of its mRNA vaccines for COVID-19 that Moderna markets under the name Spikevax®. Moderna's Spikevax® vaccines deliver instructions to cells to make a new "spike" protein, which activates the body's immune response to the virus. To make their Spikevax® vaccines work, Moderna leveraged the inventions claimed in the '118 Patent to increase mRNA stability and thus the effectiveness of their vaccines. For example, in its original Spikevax® vaccine, Moderna used Plaintiffs' patented method to remove approximately 100 identified Problem Sequences found in the COVID-19 spike protein gene to enhance the stability its mRNA and its ability to confer immunity to the virus. Upon information and belief, Moderna has continued

to use the claimed method of the ’118 Patent in connection with other mRNA vaccine embodiments, including its subsequent Spikevax® vaccines and its vaccine to treat respiratory syncitial virus (RSV), called mRESVIA®, as well as vaccines in its product pipeline, including its mRNA 1010 flu vaccine.

**ANSWER NO. 8:** Moderna admits that Spikevax® is an mRNA vaccine that directs expression of a variant of the SARS-CoV-2 spike protein, thereby stimulating an immune response. Moderna further admits that mRESVIA® is an mRNA vaccine for respiratory syncytial virus and that Moderna developed a seasonal influenza vaccine known as mRNA-1010. Moderna denies that it used or uses any method claimed in the ’118 Patent in connection with Spikevax®, mRESVIA®, mRNA-1010, or any other product or product candidate. Moderna further denies that it leveraged Plaintiffs’ alleged inventions to increase mRNA stability, protein expression, vaccine effectiveness, or the ability of any vaccine to confer immunity. Moderna further denies that Plaintiffs’ comparison of naturally occurring and accused sequences establishes performance of any claimed method. Moderna otherwise denies the allegations of Paragraph 8.

9. While Moderna chose to utilize Dr. Fischhoff and Perlak’s invention(s) to improve its COVID-19 vaccines, Plaintiffs did not have any involvement in the development of the vaccines, and Moderna used their patented method without Plaintiffs’ permission. Moderna has earned substantial benefit, including tens of billions of dollars in revenue from this unauthorized use, to develop, produce, and deliver its mRNA vaccines. Moderna has acknowledged that mRNA instability was a quintessential problem it faced in its development of an effective vaccine:

The problems that Moderna faced started with the mRNA itself. mRNA is an

unstable molecule that is quickly destroyed inside the body. Moderna scientists had to develop novel ways to stabilize mRNA by modifying its chemical structure so that it could be used in vaccines and therapeutics.

**ANSWER NO. 9:** Moderna admits that Plaintiffs had no involvement in the development of Moderna's COVID-19 vaccines. Moderna further admits that it has earned substantial revenue from sales of Spikevax®. Moderna denies that it used any method claimed in the '118 Patent, with or without Plaintiffs' permission, or that any such alleged use contributed to that revenue. Moderna admits that the quoted language appears in a complaint filed by Moderna in separate litigation, which speaks for itself based on the context in which it originally appears. Moderna denies that the quoted language refers to the gene-modification methods claimed in the '118 Patent or supports Plaintiffs' allegations of infringement. Moderna otherwise denies the allegations of Paragraph 9.

10. Moderna's mRNA stability work began within the last 10-15 years. In comparison, as confirmed by this District, the Federal Circuit, and the Patent Office in awarding priority to Fischhoff and Perlak, their groundbreaking work began more than 35 years ago. The '118 Patent is a pre-GATT patent, claiming priority to February 24, 1989, and (because of the time required for prosecution, including an 8-year interference proceeding) issued on June 22, 2010. Thus, the '118 Patent covers the entire duration of Moderna's mRNA vaccine work. The '118 patent is assigned to Monsanto Technology, LLC and is exclusively licensed to Bayer CropScience LLC.

**ANSWER NO. 10:** Moderna admits that the '118 Patent claims priority to an application filed on February 24, 1989, and issued on June 22, 2010. Moderna further admits that the face of the '118

Patent identifies Monsanto Technology LLC as its assignee. Moderna lacks knowledge or information sufficient to form a belief as to the truth of the allegation that Bayer CropScience LLC is the exclusive licensee of the ’118 Patent and therefore denies that allegation. The allegations concerning proceedings before the United States Patent and Trademark Office and federal courts, the duration and effect of the interference proceeding, the priority awarded to Drs. Fischhoff and Perlak, and the term and scope of the ’118 Patent state legal conclusions or characterize judicial and administrative records that speak for themselves, and no response is required. To the extent a response is required, Moderna denies that any such proceeding established that Drs. Fischhoff and Perlak performed “groundbreaking work” relevant to Moderna’s mRNA technology. Moderna further denies that the ’118 Patent “covers” Moderna’s mRNA vaccine work or that Moderna has practiced any method claimed in the ’118 Patent. Moderna otherwise denies the allegations of Paragraph 10.

11. The patent system provides an important, predictable framework for advancing scientific knowledge by allowing companies for a limited period to recover not less than a reasonable royalty for the use of their patented inventions. Plaintiffs thus seek compensation to which they are entitled by law “for the use made of the[ir] invention,” which is “in no event less than a reasonable royalty.” 35 U.S.C. § 284.

**ANSWER NO. 11:** The allegations of Paragraph 11 state legal conclusions and generalized characterizations of the patent system to which no response is required. Moderna admits that Plaintiffs purport to seek damages under 35 U.S.C. § 284 and that the statute contains the quoted language. The statute speaks for itself. Moderna denies that Plaintiffs are entitled to any compensation from Moderna, including any reasonable royalty, because Moderna has not

infringed any valid claim of the '118 Patent. Moderna otherwise denies the allegations of Paragraph 11.

## PARTIES

12. Plaintiff Bayer CropScience LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 800 N. Lindbergh Blvd., Creve Coeur, Missouri 63141.

**ANSWER NO. 12:** Moderna lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12 and therefore denies the allegations.

13. Plaintiff Monsanto Company is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 800 N. Lindbergh Blvd., Creve Coeur, Missouri 63141.

**ANSWER NO. 13:** Moderna lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13 and therefore denies the allegations.

14. Plaintiff Monsanto Technology LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 800 N. Lindbergh Blvd., Creve Coeur, Missouri 63141.

**ANSWER NO. 14:** Moderna lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14 and therefore denies the allegations.

15. Upon information and belief, Defendant Moderna, Inc. is a publicly traded corporation organized and existing under the laws of the State of Delaware with a principal place of business at 325 Binney Street, Cambridge, Massachusetts 02142. Upon information and belief, Moderna, Inc., is the parent company of the

other defendants and recognizes the revenue from sales of Moderna's COVID-19 vaccine, including Spikevax®, and its mResvia® vaccine.

**ANSWER NO. 15:** Moderna admits that Moderna, Inc. is a publicly traded Delaware corporation with its principal place of business at 325 Binney Street, Cambridge, Massachusetts 02142. Moderna further admits that Moderna, Inc. is the parent company of ModernaTX, Inc. and Moderna US, Inc. and recognizes revenue from sales of Spikevax® and mRESVIA®. Moderna otherwise denies the allegations of Paragraph 15.

16. Upon information and belief, Defendant ModernaTX is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 325 Binney Street, Cambridge, Massachusetts 02142. ModernaTX is a wholly-owned subsidiary of Moderna, Inc. The FDA granted the Biologic License Approval ("BLA") for Spikevax® to ModernaTX.

**ANSWER NO. 16:** Moderna admits that ModernaTX, Inc. is a Delaware corporation with its principal place of business at 325 Binney Street, Cambridge, Massachusetts 02142 and is a wholly owned subsidiary of Moderna, Inc. Moderna further admits that the FDA approved the Biologics License Application ("BLA") for Spikevax® held by ModernaTX, Inc. Moderna otherwise denies the allegations of Paragraph 16.

17. Upon information and belief, Moderna US is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 325 Binney Street, Cambridge, Massachusetts 02142. Moderna US is a wholly-owned subsidiary of Moderna, Inc. and sells Spikevax® in the United States.

**ANSWER NO. 17:** Moderna admits that Moderna US, Inc. is a Delaware corporation and is a wholly owned subsidiary of Moderna, Inc. Moderna further admits that Moderna US, Inc. sells Spikevax® in the United States. Moderna otherwise denies the allegations of Paragraph 17.

18. Upon information and belief, Defendants Moderna, Inc., ModernaTX, and Moderna US are agents of each other and/or work in concert with each other with respect to the development and regulatory approval, marketing, manufacturing, sales, offers for sale, and distribution of Moderna's infringing mRNA vaccines.

**ANSWER NO. 18:** Paragraph 18 states legal conclusions to which no response is required. To the extent a response is required, Moderna denies that Moderna, Inc., ModernaTX, Inc., and Moderna US, Inc. are agents of one another. Moderna further denies that any Moderna entity has developed, obtained regulatory approval for, marketed, manufactured, sold, offered for sale, or distributed any vaccine that infringes any valid claim of the '118 Patent. Moderna otherwise denies the allegations of Paragraph 18.

## JURISDICTION & VENUE

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*

**ANSWER NO. 19:** Paragraph 19 states legal conclusions to which no response is required. To the extent a response is required, Moderna does not contest, solely for purposes of this action, that the Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

20. This Court has personal jurisdiction over Moderna, Inc., ModernaTX, and Moderna US, because each is organized under the laws of Delaware.

**ANSWER NO. 20:** Paragraph 20 states legal conclusions to which no response is required. To the extent a response is required, Moderna does not contest, solely for purposes of this action, that the Court has personal jurisdiction over Moderna, Inc., ModernaTX, Inc., and Moderna US, Inc.

21. Venue is proper in this judicial District under 28 U.S.C. § 1400(b) with respect to Moderna, Inc., ModernaTX, and Moderna US, because each is organized and existing under the laws of Delaware and therefore reside in Delaware for purposes of venue.

**ANSWER NO. 21:** Paragraph 21 states legal conclusions to which no response is required. To the extent a response is required, Moderna does not contest, solely for purposes of this action, that venue is proper in this District as to Moderna, Inc., ModernaTX, Inc., and Moderna US, Inc.

22. Defendants Moderna, Inc., ModernaTX, and Moderna US have consented to this Court as a proper venue and its exercise of personal jurisdiction in other litigations involving their mRNA vaccines, including in *Alynylam Pharmaceuticals, Inc. v. Moderna, Inc. et al.*, C.A. No. 22-cv-335-CFC, and *Alynlyam Pharmaceuticals, Inc. v. Moderna, Inc. et al.*, C.A. No. 23-cv-580-CFC.

**ANSWER NO. 22:** Moderna admits that it did not contest personal jurisdiction or venue in the actions identified in Paragraph 22. The pleadings and other records in those actions speak for themselves. Moderna otherwise denies the allegations of Paragraph 22.

**Background**
**Scientific Background**

23. The U.S. Court of Appeals for the Federal Circuit addressed much of the scientific background to certain embodiments of Fischhoff and Perlak's invention in its decision awarding them priority. *Mycogen Plant Science v. Monsanto Company*, 243 F.3d 1316, 1322-24 (Fed. Cir. 2001). Eukaryotic organisms like plants and

animals, though incredibly diverse in appearance, have much in common at the molecular level. They are made up of vast quantities of cells with distinct nuclei that contain chromosomes. Chromosomes carry deoxyribonucleic acid, or DNA, which contains coded genetic information that cells use to make, or "express," proteins.

**ANSWER NO. 23:** The scientific principles described in Paragraphs 23 through 27—DNA structure, transcription and translation, the genetic code, and codon substitution—were well-established principles of molecular biology long before the alleged invention of the '118 Patent and were not discovered by Drs. Fischhoff or Perlak. Plaintiffs' presentation of these concepts through the *Mycogen* decision does not attribute any of this preexisting knowledge to the named inventors. With that understanding, Moderna admits that the Federal Circuit's decision in *Mycogen Plant Science, Inc. v. Monsanto Co.*, 243 F.3d 1316 (Fed. Cir. 2001), discusses certain scientific background concerning DNA, RNA, protein expression, and genetic engineering in plants. The Federal Circuit's decision speaks for itself, and Moderna denies Plaintiffs' characterization of that decision as "awarding" Drs. Fischhoff and Perlak priority as to the '118 Patent or the full scope of the alleged invention described in Paragraph 23. Moderna admits that plants and animals are eukaryotic organisms, that their cells generally contain nuclei with chromosomes, and that chromosomes contain DNA carrying genetic information used in the expression of proteins. Moderna otherwise denies the allegations of Paragraph 23.

24. DNA molecules consist of two strands running antiparallel to each other in the familiar "double helix," or twisted-ladder shape, as first described in 1953 by Doctors James Watson and Francis Crick. The strands are connected to each other, like rungs on a twisted ladder, by pairs of chemically joined molecules called

nucleotides. There are four possible nucleotides: adenine (A), thymine (T), cytosine (C), and guanine (G). Each nucleotide pairs naturally with only one other nucleotide: A pairs with T; and C pairs with G. These A/T and C/G nucleotide pairs constitute the genetic code of the cell.

**ANSWER NO. 24:** Moderna admits that DNA generally consists of two antiparallel strands arranged in a double helix and that the structure of DNA was described by James Watson and Francis Crick in 1953—more than three decades before the earliest alleged priority date of the '118 Patent. Moderna further admits that DNA generally contains four types of nucleotides, commonly identified as adenine, thymine, cytosine, and guanine, and that adenine generally pairs with thymine and cytosine generally pairs with guanine. These were well-known facts of molecular biology long before any work by the named inventors. Moderna otherwise denies the allegations of Paragraph 24.

25. Cells use DNA to express proteins through a two-step process known as transcription and translation. At the transcription phase, the code from an existing strand of DNA is copied to a newly created strand of RNA, or ribonucleic acid called mRNA, or messenger RNA. The mRNA is then translated into the encoded protein by a process which the Federal Circuit has described as follows:

> In the second step, translation, the nucleotide sequence of the mRNA is translated into the amino acid sequence of the corresponding protein. For this translation to work, a complex structure known as a ribosome reads the mRNA nucleotide sequence and generates amino acids. These amino acids are then assembled into proteins. In this way, ribosomes carry out protein synthesis.

> Ribosomes read a nucleotide sequence in sets of three nucleotides, known as codons. Each codon directs the ribosome to select a certain amino acid. For example, GCT is a codon directing the ribosome to select the amino acid alanine. Just as nucleotides are the basic units of DNA, amino acids are the basic units of proteins. Thus, a given series of codons specifies a sequence of amino acids comprising a particular protein. A protein can contain few or many amino acids. For example, some Bt pesticidal proteins contain more than 600 amino acids.
> While there are 61 possible codons, there are only 20 amino acids. Some amino acids can be specified by more than one codon. In other words, one codon can be substituted for another in the gene without changing the amino acid and resulting protein. For instance, the amino acid alanine is specified by four different codons: GCT, GCG, GCC and GCA. Two very different series of codons could produce the exact same series of amino acids. In fact, most amino acids are specified or coded by more than one codon.

**ANSWER NO. 25:** Moderna admits that cells can use DNA to express proteins through processes known as transcription and translation. Moderna further admits that the quoted language appears in the Federal Circuit's decision in *Mycogen Plant Science, Inc. v. Monsanto Co.*, 243 F.3d 1316 (Fed. Cir. 2001), which speaks for itself. Moderna admits that, during translation, a ribosome reads the coding region of an mRNA nucleotide sequence in groups of three nucleotides known as codons; that codons specify amino acids that may be assembled into a protein; and that multiple codons can specify the same amino acid, such that one such codon may be substituted for another without changing the encoded amino-acid sequence. These principles—transcription, translation,

the triplet codon system, and synonymous codon substitution—were well established long before the alleged invention and are not attributable to Drs. Fischhoff or Perlak. Moderna otherwise denies the allegations of Paragraph 25.

26. Each potential codon triplet used to express each of the 20 amino acids were known and described in Table I of the ’118 Patent.

**ANSWER NO. 26:** Moderna admits that Table I of the ’118 Patent identifies codons corresponding to each of the 20 amino acids. The ’118 Patent speaks for itself. Moderna further admits that the codons identified in Table I and their correspondence to particular amino acids—the “genetic code”—were elucidated in the 1960s and were universal scientific knowledge well before any work by Drs. Fischhoff and Perlak or the alleged inventions of the ’118 Patent. Moderna otherwise denies the allegations of Paragraph 26.

27. As the Federal Circuit has explained, the foregoing molecular processes of protein expression are common to all organisms:

> Man, other animals, plants, protozoa, and yeast are *eucaryotic* (or eukaryotic) organisms: their DNA is packaged in chromosomes in a special compartment of the cell, the nucleus. Bacteria (*procaryotic* or prokaryotic organisms) have a different organization. Their DNA, usually a circular loop, is not contained in any specialized compartment. Despite the incredible differences between them, all organisms, whether eucaryote or procaryote, whether man or mouse or lowly bacterium, use the same molecular rules to make proteins under the control of genes. In all organisms, codons in DNA are transcribed into codons in RNA which is

translated on ribosomes into polypeptides according to the same genetic code.

**ANSWER NO. 27:** Moderna admits that the quoted language appears in the Federal Circuit's decision in *Mycogen Plant Science, Inc. v. Monsanto Co.*, 243 F.3d 1316 (Fed. Cir. 2001), which speaks for itself. Moderna further admits that organisms generally use a common genetic code in the transcription of DNA into RNA and the translation of RNA into proteins. Moderna otherwise denies the allegations of Paragraph 27.

28. An unstable mRNA molecule can therefore hinder the ability of a coding sequence to express a particular protein, as it can result in poor translation and poor accumulation of the encoded protein.

**ANSWER NO. 28:** Moderna admits that degradation of an mRNA molecule within a cell can affect the amount of mRNA available for translation and, under certain circumstances, the amount of encoded protein produced. Moderna denies that "mRNA stability" is a single, uniform property or that different forms or measures of mRNA stability are interchangeable. Moderna otherwise denies the allegations of Paragraph 28.

**Plaintiffs' Scientists Discovered and Patented a Method That Resulted in Improved mRNA Stability and Protein Expression.**

29. The '118 Patent is the result of groundbreaking research done by Fischhoff and Perlak. In the mid-1980s (decades before Moderna was even founded), Fischhoff and Perlak worked on a problem later faced by Moderna in Moderna's mRNA vaccine work—namely, how to get a genetic coding sequence from a microorganism (including bacteria and viruses) to adequately express in a eukaryotic organism (a class of higher organisms that includes plants and animals).

**ANSWER NO. 29:** Moderna admits that Drs. Fischhoff and Perlak are the named inventors on the Asserted Patent. Moderna denies that their research was "groundbreaking" in the manner alleged or that Drs. Fischhoff and Perlak discovered the identified nucleotide sequences or their potential biological effects, which the '118 Patent attributes to earlier published research. Moderna further denies that Drs. Fischhoff and Perlak addressed the same problem later faced by Moderna in developing its mRNA vaccines. The '118 Patent principally concerns the expression of proteins from DNA in plants, whereas Moderna's accused vaccines deliver mRNA manufactured in vitro for protein expression in human cells. The '118 Patent and its prosecution history speak for themselves. Moderna otherwise denies the allegations of Paragraph 29.

30. The '118 Patent includes illustrative examples of Fischhoff and Perlak's method, including methods that expressed coding sequences from the bacterium *Bacillus thuringiensis* ("B.t.") and a Potato Leaf Roll Virus Coat Protein Gene. A goal of the B.t. work was to express a protein naturally made by *Bacillus thuringiensis* soil bacteria that is toxic to insects, but harmless to animals, to impart insect resistance in plants. A goal of the potato leaf roll virus coat protein work was to express the coat protein to make plants resistant to the potato leaf roll virus.

**ANSWER NO. 30:** Moderna admits that the '118 Patent includes examples involving DNA sequences derived from *Bacillus thuringiensis* and potato leaf roll virus and sets forth efforts to express certain proteins in plants. Moderna further admits that the '118 Patent sets forth efforts to impart insect resistance in plants through the expression of certain *Bacillus thuringiensis* proteins and virus resistance in plants through the expression of a viral coat protein. The '118 Patent and its prosecution history speak for themselves. Moderna denies Plaintiffs' characterization of those examples as establishing that the claimed methods generally improve mRNA stability or protein

expression outside the plant systems set forth in the '118 Patent. Moderna otherwise denies the allegations of Paragraph 30.

31. Plaintiffs' Scientists' early efforts in 1983-1986 to express naturally occurring coding sequences resulted in low levels of expression. They set out to solve the expression problem, and like Moderna, their solution "started with the mRNA itself." As the '118 patent explains:

> Several potential factors could be responsible in varying degrees for the level of protein expression from a particular coding sequence. The level of a particular mRNA in the cell is certainly a critical factor. . . . In the cytoplasm, mRNAs have distinct half-lives that are determined by their sequences and by the cell type in which they are expressed. Some RNAs are very short-lived and some are much more long-lived. In addition, there is an effect, whose magnitude is uncertain, of translational efficiency on mRNA half-life. In addition, every RNA molecule folds into a particular structure, or perhaps family of structures, which is determined by its sequence.

**ANSWER NO. 31:** Moderna lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning Drs. Fischhoff and Perlak's work or experimental results between 1983 and 1986 and therefore denies those allegations. Moderna denies that Drs. Fischhoff and Perlak addressed the same expression problem as Moderna or that their alleged solution, "like Moderna," started with the mRNA itself. The comparison conflates different technologies, problems, and solutions. Moderna admits that the quoted language appears in the '118 Patent,

which speaks for itself, and denies that the quotation establishes that Moderna used any method claimed in the '118 Patent. Moderna otherwise denies the allegations of Paragraph 31.

32. In 1986, Fischhoff and Perlak conceived a solution revolving around certain sequences prevalent in certain bacterial and viral origin coding sequences that had contributed to mRNA instability in higher organisms. Fischhoff and Perlak theorized that these sequences were likely destabilizing for expression in plants and animals alike:

> Some particular sequences have been identified in RNAs that have the potential for having a specific effect on RNA stability. This section summarizes what is known about these sequences and signals. These identified sequences often are A+T rich, and thus are more likely to occur in an A+T rich coding sequence such as a B.t. gene. The sequence motif ATTTA (or AUUUA as it appears in RNA) has been implicated as a destabilizing sequence in mammalian cell mRNA (Shaw and Kamen, 1986). No analysis of the function of this sequence in plants has been done. Some studies on mRNA degradation in animal cells also indicate that RNA degradation may begin in some cases with nucleotlytic attack in A+T rich regions. It is not clear if these cleavages occur at ATTTA sequences. There are also examples of mRNAs that have differential stability depending on the cell type in which they are expressed or on the stage within the cell cycle at which they are expressed.
> The addition of a polyadenylate string to the 3' end is common to most eucaryotic mRNAs, both plant and animal. The currently accepted view of

poly A addition is that the nascent transcript extends beyond the mature 3' terminus. Contained within this transcript are signals for polyadenylation and proper 3' end formation. This processing at the 3' end involves cleavage of the mRNA and addition of poly A to the mature 3' end. By searching for consensus sequences near the polyA tract in both plant and animal mRNAs, it has been possible to identify consensus sequences that apparently are involved in poly A addition and 3' end cleavage. The same consensus sequences seem to be important to both of these processes. These signals are typically a variation on the sequence AATAAA. In animal cells, some variants of this sequence that are functional have been identified; in plant cells there seems to be an extended range of functional sequences (Wickens and Stephenson, 1984; Dean et al., 1986). Because all of these consensus sequences are variations on AATAAA, they all are A+T rich sequences. This sequence is typically found 15 to 10 bp before the poly A tract in a mature mRNA. Experiments in animal cells indicate that this sequence is involved in both polyA addition and 3' maturation. From these examples, it is clear that in natural mRNAs proper polyadenylation is important in mRNA accumulation, and that disruption of this process can effect mRNA levels significantly. However, insufficient knowledge exists to predict the effect of changes in a normal gene. In a heterologous gene, where we do not know if the putative polyA sites (consensus sequences) are functional, it is even harder to predict the consequences. However, it is possible that the putative sites identified are

> disfunctional. That is, these sites may not act as proper polyA sites, but instead function as aberrant sites that give rise to unstable mRNAs.

**ANSWER NO. 32:** Moderna lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning when or what Drs. Fischhoff and Perlak conceived and therefore denies those allegations. Moderna denies that Drs. Fischhoff and Perlak discovered the identified sequences or established that those sequences destabilize mRNA in plants and animals alike. Indeed, the quoted portions of the '118 Patent attribute the identification and study of those sequences and their potential effects to earlier published research, state that no analysis of the function of the ATTTA sequence in plants had been performed, and acknowledge uncertainty as to whether putative polyadenylation sites are functional or destabilizing in a particular gene. Moderna admits that the quoted language appears in the '118 Patent, which speaks for itself. Moderna otherwise denies the allegations of Paragraph 32.

33. In addition to the ATTTA sequence, Fischhoff and Perlak identified 16 AT-rich "Potential Polyadenylation Signals" in Table II of the '118 Patent that they believed contributed to mRNA instability in plant and animal cells ("Table II Sequences"):

**Figure 1**

**’118 Patent, Table II (15:50-64)**

TABLE II

| List of Sequences of the Potential Polyadenylation Signals | |
|---|---|
| AATAAA* | AAGCAT |
| AATAAT* | ATTAAT |
| AACCAA | ATACAT |
| ATATAA | AAAATA |
| AATCAA | ATTAAA** |
| ATACTA | AATTAA** |
| ATAAAA | AATACA** |
| ATGAAA | CATAAA** |

*indicates a potential major plant polyadenylation site.
**indicates a potential minor animal polyadenylation site.
All others are potential minor plant polyadenylation sites.

**ANSWER NO. 33:** Moderna admits that Table II of the ’118 Patent lists 16 sequences described as “Potential Polyadenylation Signals.” Moderna denies that Drs. Fischhoff and Perlak identified or discovered those sequences, which the ’118 Patent attributes to earlier published research. Moderna further denies that Drs. Fischhoff and Perlak established or believed that each of the Table II sequences contributes to mRNA instability in both plant and animal cells. Indeed, the ’118 Patent characterizes the listed sequences as potential polyadenylation signals, distinguishes between potential plant and animal signals, and acknowledges uncertainty as to whether such sequences function as polyadenylation signals or destabilize mRNA in any particular gene or cell type. The ’118 Patent, including Table II, speaks for itself. Moderna otherwise denies the allegations of Paragraph 33.

34. Plaintiffs’ Scientists conceived replacing of Table II Sequences and “ATTTA” sequences found in native mRNA with “sense” codons encoding for the same amino acid would increase mRNA stability, resulting in better protein expression.

**ANSWER NO. 34:** Moderna lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning what Drs. Fischhoff and Perlak conceived and therefore denies those allegations. Moderna further denies that they discovered the identified sequences, synonymous codon substitution, or the potential relationship between certain nucleotide motifs and RNA stability. The '118 Patent attributes the identification of ATTTA as a potentially destabilizing sequence in mammalian-cell mRNA to Shaw and Kamen, the identification of potential polyadenylation signal sequences to Wickens and Stephenson and Dean et al., and prior use of synonymous codon replacement to increase expression and mRNA levels to Hoekema et al. *See* '118 Patent at 1:60–2:20, 2:51–3:9, 6:11–26. Thus, even if Drs. Fischhoff and Perlak conceived a particular application of those concepts to DNA coding sequences intended for expression in plants (a point on which Moderna presently lacks knowledge or information sufficient to form a belief), the underlying sequences, potential relationships, and substitution technique were not their discoveries. Moderna otherwise denies the allegations of Paragraph 34.

35. The '118 Patent describes that "[i]t is also preferred that regions comprising many consecutive A+T bases … are disrupted since these regions are predicted to have a higher likelihood to form hairpin structure due to self-complementarity." The '118 Patent explains that "[i]n most cases, the adverse effects may be minimized by using sequences which do not contain more than five consecutive A+T or G+C." Elsewhere, the '118 patent explains "Of course, due to the A+T content of B.t. genes, they are rich in runs of A or T that could act as terminators."

**ANSWER NO. 35:** Moderna admits that the quoted language appears in the '118 Patent, which speaks for itself. Moderna denies, however, that the quoted language establishes that regions containing consecutive A+T or G+C nucleotides necessarily form hairpin structures, adversely

affect mRNA stability or protein expression, or that reducing such regions necessarily minimizes any such effects. The patent describes these propositions in expressly qualified and predictive terms, stating that such regions "are predicted" to have a higher likelihood of forming hairpin structures and that, only "[i]n most cases, the adverse effects may be minimized" by avoiding more than "five consecutive A+T or G+C" nucleotides. *See* '118 Patent at 10:60–11:2. Elsewhere, the patent similarly states only that A- or T-rich runs in B.t. genes "could act as terminators." *See id.* at 5:66–6:4. Moderna denies Plaintiffs' remaining characterizations of the quoted language and otherwise denies the allegations of Paragraph 35.

> 36. The '118 Patent discloses that utilizing Fischhoff and Perlak's method to reduce Problem Sequences in the gene's coding region resulted in a dramatic increase in protein expression. Plaintiffs' Scientists utilized their novel method with well-known genetic engineering techniques like site-directed mutagenesis and *de novo* synthesis. In one example, Plaintiffs' Scientists observed a 500-fold increase in the expression of B.t.k. protein with a coding sequence modified to remove nearly all of the Problem Sequences, and a 100-fold increase in plants with a coding sequence modified to remove nearly half of those sequences. These increases in protein expression resulted in corresponding increases in bioactivity: Whereas plants with the native coding sequence received "only minimal protection" against insect damage, plants with half-modified coding sequence showed "almost complete protection" and plants with fully-modified coding sequence were "totally protected." Plaintiffs' Scientists concluded that these results were caused by increases in mRNA levels and translation efficiency attributable to their method of reducing Problem Sequences.

**ANSWER NO. 36:** Moderna admits that the '118 Patent includes purported experiments involving certain *Bacillus thuringiensis* DNA coding sequences and reported differences in protein expression and insect resistance in certain plants. The '118 Patent and its prosecution history speak for themselves. Moderna further admits that, as Plaintiffs themselves acknowledge, site-directed mutagenesis and *de novo* synthesis are "well-known genetic engineering techniques" that predate the alleged invention. Thus, what Plaintiffs characterize as a "novel method" consisted of applying preexisting knowledge—previously identified sequence motifs and their potential relationship to mRNA stability—through conventional laboratory techniques to a particular plant-expression problem. Moderna denies that the reported results establish that reducing what Plaintiffs characterize as "Problem Sequences" caused any particular increase in mRNA stability, protein expression, or bioactivity, or that those results establish any generally applicable relationship outside the particular plant systems tested. Moderna otherwise denies the allegations of Paragraph 36.

37. Plaintiffs' Scientists also disclosed that their method could be used "to express [a] viral coat protein at an effective level" and thereby "achieve virus resistance." In one example, they designed a coding sequence that removed Problem Sequences from the native sequence of "the coat protein gene from potato leaf roll virus" to make a "synthetic gene [] designed to improve plant expression of the [viral] coat protein" while encoding the same protein as the naturally occurring gene. The '118 Patent states that plants with the modified coding sequence "express the [viral] coat protein at higher levels than achieved with the naturally occurring gene" and "exhibit increased resistance to infection" by the virus.

**ANSWER NO. 37:** Moderna admits that the '118 Patent includes an example involving modification of a DNA coding sequence for a potato leaf roll virus coat protein for expression in plants. The '118 Patent and its prosecution history speak for themselves. Moderna denies that the '118 Patent establishes that the reported results were caused by removing what Plaintiffs characterize as "Problem Sequences," by increased mRNA stability, or by any generally applicable relationship between the identified sequences and protein expression. Moderna otherwise denies the allegations of Paragraph 37.

38. After discovering their novel method, Plaintiffs' Scientists timely sought legal protection for their invention, filing patent application No. 07/315,355 on February 24, 1989. Following a lengthy examination period that included an eight-year interference proceeding that confirmed their earlier invention date, the '118 Patent issued on June 22, 2010.

**ANSWER NO. 38:** Moderna admits that U.S. Patent Application No. 07/315,355 was filed on February 24, 1989, and that the '118 Patent issued on June 22, 2010. Moderna further admits that proceedings concerning related subject matter included an interference. The '118 Patent, its prosecution history, and the records of the interference proceeding speak for themselves. Moderna denies Plaintiffs' remaining characterizations of the alleged invention and the interference proceeding and otherwise denies the allegations of Paragraph 38.

39. While the '118 Patent includes claims reciting methods of making structural genes encoding insecticidal proteins, Plaintiffs' Scientists did not limit their claims and disclosure to a particular gene, cell, or expression level. Instead, Plaintiffs' Scientists claimed and described method steps for reducing the specific Problem Sequences they found contributed to unstable mRNAs. They described the "most

rigorous application" of this "present invention" as modification of a coding sequence "by removal of ATTTA sequences and putative polyadenylation signals" (*i.e.*, Table II Sequences). They further described that "if a synthetic gene is prepared which codes for the expression of the subject protein, codons are selected to avoid the [Problem Sequences]." Claim 59, for example, recites "[a] method for making a structural gene that encodes a protein" comprising three steps: "(a) starting with a coding sequence that encodes a protein and that contains polyadenylation signal sequences listed in Table II; (b) reducing the number of said polyadenylation signal sequences in the coding sequence by substituting sense codons for codons in the coding sequence; and (c) making a structural gene that comprises a coding sequence that includes the codons substituted according to step (b) and is characterized by the reduced number of Table II polyadenylation signal sequences, and that encodes the protein." Claims 60 and 73 recite additionally reducing ATTTA sequences, and Claims 79 and 80 recite additionally reducing regions with greater than five consecutive adenine and thymine (A+T) nucleotides.

**ANSWER NO. 39**: Moderna admits that the quoted language appears in the '118 Patent but denies the characterizations and implications Plaintiffs seek to draw from it. The claims, specification, and prosecution history of the '118 Patent speak for themselves. Moderna denies that the specification's discussion of synthetic-gene preparation eliminates or alters the method steps expressly required by claim 59. Moderna further denies Plaintiffs' characterizations of the scope, meaning, or effect of the asserted claims and otherwise denies the allegations of Paragraph 39.

40. The ’118 Patent was filed before implementation of the General Agreement on Tariffs and Trade (GATT). As a pre-GATT patent, the ’118 Patent’s term extends 17 years from the date of issuance—through June 22, 2027.

**ANSWER NO. 40:** Paragraph 40 is a legal conclusion to which no response is required.

**Moderna Developed mRNA Products Using Plaintiffs’ Patented Method.**

To the extent the foregoing heading purports to contain allegations, Moderna denies them.

41. Moderna was founded in 2010. Its name comes from a combination of the words “modified” and “RNA.” Since its founding, Moderna has focused on what it calls “messenger RNA Therapeutics,” or the use of modified mRNA to “stimulat[e] the body’s natural ability to produce therapeutic proteins.” Moderna’s “mRNA medicines use a specific nucleotide sequence to encode instructions to make the exact protein needed for a particular disease.”

**ANSWER NO. 41**: Moderna admits that Moderna was founded in 2010 and that its name combines “modified” and “RNA.” Moderna admits that the quoted language appears in materials published by Moderna, which speak for themselves based on the context in which they originally appear. Moderna denies that it has used any method claimed in the ’118 Patent to develop any mRNA product. Moderna otherwise denies the allegations of Paragraph 41.

42. Upon information and belief, Moderna has designed and manufactured its mRNA products in the United States, including its infringing mRNA vaccine products. In 2014, Moderna opened its headquarters and labs in Cambridge, Massachusetts. In 2016, Moderna signed a lease to build a 200,000 square foot mRNA clinical manufacturing facility in Norwood, Massachusetts. Moderna has credited its ability to move quickly in creating its infringing COVID-19 mRNA vaccine in

part to its "decision in 2016 to build a manufacturing plant in Massachusetts." This "integrated plant capable of full-scale development production" was "operational by summer 2018."

**ANSWER NO. 42:** Moderna admits that it opened new facilities in Cambridge, Massachusetts in or around 2014 and subsequently constructed a manufacturing facility in Norwood, Massachusetts. Moderna further admits that the quoted language appears in materials published by Moderna, which speak for themselves based on the context in which they originally appear. Moderna denies that any of its mRNA vaccines infringes any valid claim of the '118 Patent. Moderna otherwise denies the allegations of Paragraph 42.

43. According to the Center for Disease Control ("CDC"), Moderna's Spikevax® COVID-19 vaccine works on the basic premise illustrated below.

**Figure 2**
**mRNA Vaccines CDC Publication**[39]




**ANSWER NO. 43:** Moderna admits that the Complaint purports to reproduce a CDC graphic concerning how mRNA COVID-19 vaccines work. The graphic and the CDC publication from which it was taken speak for themselves. Moderna denies Plaintiffs' characterization of the graphic as illustrating the "basic premise" of Spikevax® to the extent that characterization is incomplete, inaccurate, or suggests that Moderna used any method claimed in the '118 Patent. Moderna otherwise denies the allegations of Paragraph 43.

44. Briefly, modified mRNA coding for a protein based on the SARS-CoV-2 spike protein is generated and introduced into the human body. Ribosomes in the body then translate the mRNA into the spike protein so that the body generates

antibodies capable of binding to the spike protein. If a vaccinated person later encounters the SARS-CoV-2 virus, these antibodies may bind to the virus's spike proteins to help stop its spread. Thus, these vaccines will not be effective if the mRNA is unstable and unable to adequately express the spike protein.

**ANSWER NO. 44:** Moderna admits that Spikevax® contains a full-length variant of the wildtype SARS-CoV-2 spike protein containing two proline substitutions and that, following administration, cellular ribosomes translate the mRNA to produce the encoded protein, which stimulates an immune response. Moderna denies that the protein encoded by Spikevax® is the native SARS-CoV-2 spike protein. Moderna otherwise denies the allegations of Paragraph 44.

45. To develop effective mRNA medicines, Moderna needed to stabilize the mRNA molecule and optimize its protein expression. Moderna has recognized that this required optimizing the mRNA molecule itself:

> The problems that Moderna faced started with the mRNA itself. mRNA is an unstable molecule that is quickly destroyed inside the body. Moderna scientists had to develop novel ways to stabilize mRNA by modifying its chemical structure so that it could be used in vaccines and therapeutics. Moderna also optimized its mRNA platform to make it more effective at producing the proteins needed to fight and prevent disease.

**ANSWER NO. 45:** Moderna admits that mRNA stability and protein expression are among the considerations relevant to the development of mRNA medicines. Moderna further admits that the quoted language appears in a complaint previously filed by Moderna, which speaks for itself in its original context. Moderna denies that the quoted language describes use of any method claimed

in the ’118 Patent or otherwise supports Plaintiffs’ allegations of infringement. Moderna otherwise denies the allegations of Paragraph 45.

46. Moderna’s mRNA platform used “sequence engineering” to “[m]aximiz[e] protein expression” and “optimize the amount of protein produced per mRNA.” This included “design[ing] the nucleotide sequence of the coding region to maximize its successful translation into protein.”

**ANSWER NO. 46:** Moderna admits that materials published by Moderna discuss sequence engineering and designing nucleotide sequences for protein expression. Those materials speak for themselves based on the context in which they originally appear. Moderna denies that it used any method claimed in the ’118 Patent and otherwise denies the allegations of Paragraph 46.

47. Moderna’s website claims “we maximize the utility of mRNA in our proprietary, web-based mRNA Design Studio.” Under the caption “mRNA tailoring,” Moderna asserts that its “in-house digital application suite contains a Sequence Designer module to tailor an entire mRNA.” According to the posted video on Moderna’s “Research Engine,” its “algorithms consider sequence, structure, and other factors to identify mRNA sequences that are predicted to confer desired pharmacologic properties.”

**ANSWER NO. 47:** Moderna admits that the quoted language appears in materials published by Moderna concerning its mRNA Design Studio, Sequence Designer module, and Research Engine. Those materials speak for themselves based on the context in which they originally appear. Moderna denies that those materials describe use of any method claimed in the ’118 Patent or support Plaintiffs’ allegations of infringement. Moderna otherwise denies the allegations of Paragraph 47.

48. In early 2020, when reports of COVID-19 first began to emerge, Moderna "was able to respond rapidly" by developing an mRNA vaccine "specifically targeting COVID-19." Unlike "traditional vaccine development" that used "a dead or weakened version of the novel coronavirus or one of its components," Moderna's mRNA vaccine development "use[d] the information from the virus to teach the cells in a patient's body how to make the virus's Spike protein, which itself provokes a protective immune response." "[T]his ... approach" enabled Moderna to "progress[] from genetic sequencing to a vaccine ready for human testing in just 63 days."

**ANSWER NO. 48:** Moderna admits that, in January 2020, it began developing an mRNA vaccine against COVID-19 that was able to be rapidly advanced into clinical testing. Moderna further admits that the quoted language appears in materials published by Moderna, which speak for themselves based on the context in which they originally appear. Moderna denies that the protein encoded by its original COVID-19 vaccine is the native SARS-CoV-2 spike protein. Moderna otherwise denies the allegations of Paragraph 48.

49. The native genetic sequence for the original SARS-CoV-2 spike protein became public on January 11, 2020. "Within a matter of days," Moderna "took that information to create an mRNA sequence encoding for the virus's spike protein" for its original monovalent Spikevax® vaccine. That sequence is called mRNA-1273. Moderna was "able to research and develop mRNA-1273 so quickly because [Moderna] leveraged [its] prior research on vaccines and other mRNA-based medicines." It "began to develop mRNA-1273 by reviewing the genetic sequence for the Spike protein" and "design[ing] a[nd] synthesiz[ing] a corresponding

mRNA sequence." As detailed below, part of that design process included eliminating all or substantially all of the Problem Sequences that were present in the native sequence. Moderna made the mRNA in its mRNA-1273 vaccines by creating a DNA template which was transcribed in vitro.

**ANSWER NO. 49:** Moderna admits that the SARS-CoV-2 genome sequence was publicly released in January 2020 and that Moderna subsequently designed and synthesized the mRNA coding sequence used in mRNA-1273. Moderna denies that it began with or modified the native SARS-CoV-2 spike-protein nucleotide sequence. Moderna further denies that it identified and eliminated all or substantially all of what Plaintiffs characterize as "Problem Sequences," or that it used any method claimed in the '118 Patent. Moderna otherwise denies the allegations of Paragraph 49.

50. Upon information and belief, Moderna's ability to quickly and effectively design and synthesize mRNA-1273 was enabled in part by its use of Plaintiffs' patented method for removing the Problem Sequences identified in the '118 Patent by substituting sense codons.

**ANSWER NO. 50:** Moderna denies the allegations of Paragraph 50.

51. Moderna proved the effectiveness of mRNA-1273 in clinical trials. Less than a month after designing the coding sequence for mRNA-1273, Moderna used its DNA template to manufacture its first clinical samples of mRNA-1273. The Phase I trial of Moderna's resulting mRNA vaccine, branded as Spikevax®, began in March 2020; Phase II began in May 2020, and Phase III began in July 2020. These trials demonstrated mRNA-1273's significant (94%) effectiveness in preventing infection from the original coronavirus strain after a two-dose regimen.

**ANSWER NO. 51:** Moderna admits that it manufactured clinical samples of mRNA-1273. Moderna admits that Phase I, Phase II, and Phase III clinical trials of mRNA-1273 began in March 2020, May 2020, and July 2020, respectively, and that those trials demonstrated that mRNA-1273 was effective under the conditions evaluated. Moderna otherwise denies the allegations of Paragraph 51.

52. The successful clinical results of Moderna's mRNA vaccine led to a series of regulatory approvals in the United States market. The FDA first approved Spikevax® for adults under an emergency use authorization in December 2020, followed by a number of other approvals. For example, the FDA provided an emergency-use authorization for a "booster" dose of mRNA-1273 in November 2021. Moderna eventually received full commercial approval for mRNA-1273 and a second booster dose of same.

**ANSWER NO. 52:** Moderna admits that the FDA first authorized the Moderna COVID-19 Vaccine for emergency use in December 2020 and subsequently granted additional authorizations and approvals relating to Moderna's COVID-19 vaccines. Moderna further admits that the FDA approved the original formulation of Spikevax® for certain adults in January 2022. The FDA's authorizations, approvals, and associated regulatory records speak for themselves. Moderna otherwise denies the allegations of Paragraph 52.

53. Moderna has since developed booster vaccines and monovalent and bivalent boosters for variants of COVID-19. Moderna has developed additional mRNA sequences targeting SARS-CoV-2 spike protein variants, including mRNA-1273.214 for the BA.1 variant, mRNA-1273.222 for the BA.4/5 variant, mRNA-1273.815 for the XBB.1.5 variant, and mRNA-1273.712 for the KP.2 variant.

**ANSWER NO. 53:** Moderna admits that it has developed monovalent and bivalent COVID-19 vaccines directed to variants of SARS-CoV-2. Moderna further admits that Moderna has used the designations mRNA-1273.214, mRNA-1273.222, mRNA-1273.815, and mRNA-1273.712 in connection with certain COVID-19 vaccine formulations directed to SARS-CoV-2 variants. Moderna otherwise denies the allegations of Paragraph 53.

54. Upon information and belief, Moderna used similar coding sequence design protocols for its mRNA sequences targeting SARS-CoV-2 spike protein variants, including designing their coding sequences to have none or substantially none of the Problem Sequences present in the respective spike protein starting sequences by substituting sense codons, as illustrated below:

| Reductions of Table II Sequences | | | | |
|---|---|---|---|---|
| Variant mRNAs | mRNA-1273 | mRNA-1273.214 | mRNA-1273.222 | mRNA-1273.815 |
| Starting Sequence | 30 | 27 | 28 | 29 |
| Vaccine Sequence | 1 | 0 | 1 | 1 |

| Reductions of ATTTA Sequences | | | | |
|---|---|---|---|---|
| Variant mRNAs | mRNA-1273 | mRNA-1273.214 | mRNA-1273.222 | mRNA-1273.815 |
| Starting Sequence | 7 | 6 | 7 | 7 |
| Vaccine Sequence | 0 | 0 | 0 | 0 |

| Reductions of Regions with >5 A+T | | | | |
|---|---|---|---|---|
| Variant mRNAs | mRNA-1273 | mRNA-1273.214 | mRNA-1273.222 | mRNA-1273.815 |
| Starting Sequence | 68 | 70 | 71 | 70 |
| Vaccine Sequence | 0 | 0 | 0 | 0 |

**ANSWER NO. 54:** Moderna denies that it designed the identified coding sequences by starting with the respective native SARS-CoV-2 spike-protein coding sequences and reducing the occurrence of what Plaintiffs characterize as “Problem Sequences” through the substitution of

sense codons. Moderna further denies that the table reproduced in Paragraph 54 establishes that Moderna used any method claimed in the '118 Patent. Moderna otherwise denies the allegations of Paragraph 54.

55. Upon information and belief, Moderna also received regulatory approvals in more than 70 foreign markets for its bivalent and monovalent COVID-19 mRNA vaccines. Upon information and belief, the coding sequence for all such vaccines sold in the United States and internationally was originally designed and made by Moderna in the United States.

**ANSWER NO. 55:** Moderna admits that it has received regulatory authorizations or approvals outside the United States for certain monovalent and bivalent COVID-19 vaccines. The relevant regulatory records speak for themselves. Moderna lacks sufficient information about what Plaintiffs mean by "coding sequence[s]" in Paragraph 55 to admit or deny the allegations of Paragraph 55 concerning where "coding sequence[s]" for Moderna's COVID-19 vaccines were "designed and made." Moderna further denies that it performed any method claimed in the '118 Patent in the United States or elsewhere. Moderna otherwise denies the allegations of Paragraph 55.

56. Moderna has generated tens of billions of dollars in revenue from the sale of its COVID-19 mRNA vaccines. In 2020, Moderna reported $200 million in revenue from global sales of its COVID-19 vaccine, virtually all of which was in the United States. In 2021, Moderna reported $17.7 billion in revenue from global sales of its COVID-19 vaccine, including $5.4 billion in the United States. In 2022, Moderna reported $18.4 billion in revenue from global sales of its COVID-19 vaccine, including $4.4 billion in the United States. In 2023, Moderna reported $6.7 billion

in revenue from global sales of its COVID-19 vaccine, including $1.7 billion in the United States. In 2024, Moderna reported $3.1 billion in revenue from global sales of its COVID-19 vaccine, including $1.7 billion in the United States. Through Q3 of 2025, Moderna reported $1.2 billion in revenue from global sales of its COVID-19 vaccine, including $897 million in the United States. Upon information and belief, Moderna has generated over $47 billion in global sales revenue attributable to its mRNA COVID-19 vaccines, including over $14 billion in the United States. Upon information and belief, all of these sales resulted from Moderna's activities infringing the '118 patent in the United States.

**ANSWER NO. 56:** Moderna admits that it has generated substantial revenue from sales of its COVID-19 vaccines. Moderna further admits that its public financial statements report revenue relating to sales of its COVID-19 vaccines. Those financial statements speak for themselves. Moderna denies that any such revenue resulted from infringement of the '118 Patent or from Moderna's use of any method claimed in the '118 Patent. Moderna otherwise denies the allegations of Paragraph 56.

57. Moderna has also received substantial grant revenue attributable to its development of mRNA-1273. For example, in April 2020, Moderna entered into an agreement with the Biomedical Advanced Research and Development Authority (BARDA) for an award of up to $483 million to accelerate development of mRNA-1273. Upon information and belief, this agreement has been amended to increase Moderna's maximum award attributable to mRNA-1273's development efforts to $1.8 billion. In 2020, 2021, 2022, and 2023, Moderna

reported grant revenue from the BARDA agreement of $522 million, $713 million, $372 million, and $88 million, respectively.

**ANSWER NO. 57:** Moderna admits that it entered into an agreement with BARDA relating to the development of mRNA-1273 and that Moderna has reported grant revenue relating to that agreement. The agreement, any amendments thereto, and Moderna's public financial statements speak for themselves. Moderna denies that any such award or revenue is attributable to infringement of the '118 Patent or to Moderna's use of any method claimed in the '118 Patent. Moderna otherwise denies the allegations of Paragraph 57.

58. Moderna continues to generate revenue from its COVID-19 mRNA vaccines. In 2023, Moderna announced a 400% price increase for its COVID-19 mRNA vaccine. As of March 2024, Moderna estimated a roughly $10 billion market for all COVID-19 vaccines.

**ANSWER NO. 58:** Moderna admits that it continues to generate revenue from sales of its COVID-19 vaccines and that, in 2023, Moderna publicly discussed pricing for its COVID-19 vaccines following the transition to the commercial market. Moderna further admits that Moderna publicly discussed estimates concerning the market for COVID-19 vaccines. Moderna's public statements speak for themselves. Moderna denies Plaintiffs' characterization of Moderna's pricing as a "400% price increase" and otherwise denies the allegations of Paragraph 58.

59. Moderna has also developed a vaccine for lower respiratory tract disease caused by respiratory syncytial virus (RSV), which it markets under the name mRESVIA®. mRESVIA® "is an mRNA vaccine encoding a stabilized prefusion F glycoprotein from RSV A strain formulated in lipid nanoparticles." Moderna also refers to mRESVIA® as "mRNA-1345," and the modified RNA sequence in

mRESVIA® is known as "RNA-100-AR02." Moderna makes mRESVIA® with the "same manufacturing process" as its COVID-19 vaccines, including the use of "the same equipment, people, and raw material." "RNA-100-AR02 is manufactured and tested at the site ModernaTX, Inc. (ModernaTX Norwood) One Moderna Way Norwood, MA 02062 USA." Shown in the table below is a comparison of the coding sequence for the stabilized prefusion F glycoprotein and Moderna's mRESVIA® sequence. Upon information and belief, mRNA-1345 and RNA-100-AR02 were made by a method which resulted in a reduced number of Problem Sequences compared to the starting sequence by substituting sense codons.

| mRESVIA® | | | |
|---|---|---|---|
| | **Reductions of Table II Sequences** | **Reductions of ATTTA Sequences** | **Reductions of Regions with >5 A+T** |
| Starting Sequence | 22 | 3 | 34 |
| Vaccine Sequence | 0 | 0 | 0 |

**ANSWER NO. 59:** Moderna admits that mRESVIA® is an mRNA vaccine for lower respiratory tract disease caused by respiratory syncytial virus and that it contains mRNA encoding an engineered variant of the wildtype RSV protein. Moderna further admits that Moderna has used the designations mRNA-1345 and RNA-100-AR02 in connection with mRESVIA®. Moderna admits that certain quoted language appears in regulatory materials concerning mRESVIA®, which speak for themselves. Moderna denies that the coding sequence used in mRESVIA® was generated by starting with the sequence selected by Plaintiffs and reducing what Plaintiffs characterize as "Problem Sequences" through the substitution of sense codons. Moderna further

denies that the table reproduced in Paragraph 59 establishes that Moderna used any method claimed in the ’118 Patent. Moderna otherwise denies the allegations of Paragraph 59.

60. Upon information and belief, Moderna continues to use the same design protocol with respect to its other mRNA vaccine products currently in its product pipeline, including its mRNA-1010 flu vaccine.

**ANSWER NO. 60:** Moderna denies that it uses or has used any method claimed in the ’118 Patent to design mRNA-1010 or any other product or product candidate. Moderna otherwise denies the allegations of Paragraph 60.

**Count 1: Infringement of the ’118 Patent**

61. Plaintiffs repeat and re-allege the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER NO. 61:** Moderna incorporates its responses to the preceding paragraphs as if fully set forth herein.

62. On June 22, 2010, the United States Patent and Trademark Office issued the ’118 Patent. A true and correct copy of the ’118 Patent is attached as **Exhibit A**.

**ANSWER NO. 62:** Moderna admits that the United States Patent and Trademark Office issued the ’118 Patent on June 22, 2010, and that a purported copy of the ’118 Patent is attached to the Complaint as Exhibit A. The ’118 Patent speaks for itself. Moderna otherwise denies the allegations of Paragraph 62.

63. Plaintiffs collectively own all rights, titles, and interests in the ’118 Patent, including the right to assert all causes of action under the ’118 Patent and the right to remedies obtained on the ’118 Patent.

**ANSWER NO. 63:** Moderna lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning Plaintiffs' respective rights, title, and interests in the '118 Patent and therefore denies those allegations.

64. Each claim of the '118 Patent is in effect, valid, and enforceable.

**ANSWER NO. 64:** Paragraph 64 states legal conclusions to which no response is required. To the extent a response is required, Moderna denies the allegations of Paragraph 64.

65. Moderna has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '118 Patent, in violation of 35 U.S.C. § 271(a) and (g). For example, Moderna performed and/or directed the performance of the infringing method by its agents in the United States to make the SARS-CoV-2 spike protein coding sequences and/or DNA template and RSV F glycoprotein coding sequences and/or DNA template used to make all of its COVID-19 and RSV vaccine products sold worldwide. Accordingly, Moderna's worldwide sales of the Accused Products are enabled by and causally connected to Moderna's acts of infringement in the United States. Moderna makes, uses, offers for sale, sells, and/or imports certain products made by the claimed method, including but not limited to Moderna's COVID-19 vaccines incorporating mRNA-1273, mRNA-1273.214, mRNA-1273.222, mRNA-1273.815, and/or mRNA-1273.712, Moderna's mRESVIA® vaccine (including foreign or domestic variants or equivalents thereof sold under different commercial names), as well as other mRNA vaccine products currently in its product pipeline, including its mRNA-1010 flu vaccine, which were developed using the infringing method to reduce Problem Sequences (the "Accused Products").

**ANSWER NO. 65:** Moderna denies that it has directly infringed or continues to directly infringe, literally or under the doctrine of equivalents, any valid claim of the ’118 Patent under 35 U.S.C. §§ 271(a), 271(g), or otherwise. Moderna further denies that it performed or directed the performance of any method claimed in the ’118 Patent, that any Moderna product was made using any such method, or that Moderna’s worldwide sales are causally connected to any act of infringement in the United States. Moderna otherwise denies the allegations of Paragraph 65.

66. For purposes of illustration and example, Claim 59 of the ’118 Patent recites:

> A method of making a structural gene that encodes a protein, the method comprising:
> (a) starting with a coding sequence that encodes a protein and that contains polyadenylation signal sequences listed in Table II;
> (b) reducing the number of said polyadenylation signal sequences in the coding sequence by substituting sense codons for codons in the coding sequence; and (c) making a structural gene that comprises a coding sequence that includes the codons substituted according to step (b) and is characterized by the reduced number of Table II polyadenylation signal sequences, and that encodes the protein.

**ANSWER NO. 66:** Moderna admits that claim 59 of the ’118 Patent contains the quoted language. The ’118 Patent, including its claims, specification, and prosecution history, speaks for itself. Moderna denies Plaintiffs’ characterizations of the scope, meaning, or effect of claim 59 and otherwise denies the allegations of Paragraph 66.

67. Upon information and belief, the method performed by Moderna in making the Accused Products satisfies all elements of Claim 59 of the ’118 Patent.

**ANSWER NO. 67:** Moderna denies the allegations of Paragraph 67.

68. Moderna "start[ed] with a coding sequence that encodes a protein and that contains polyadenylation signal sequences listed in Table II." For example, upon information and belief, the viral coding sequences for the SARS-CoV-2 spike proteins and RSV F glycoprotein (including their respective subunit proteins) encoded by the mRNA in the Accused Products contain Table II Sequences.

**ANSWER NO. 68:** Moderna denies that it started with any of the viral coding sequences alleged in Paragraph 68. Moderna further denies that it performed any method satisfying all limitations of claim 59. Moderna otherwise denies the allegations of Paragraph 68.

69. Moderna "reduc[ed] the number of said polyadenylation signal sequences in the coding sequence by substituting sense codons for codons in the coding sequence." For example, upon information and belief, Moderna designed the SARS-CoV-2 spike protein and RSV F glycoprotein coding sequences and/or DNA templates for the Accused Products to have a reduced number of Table II Sequences by substituting sense codons.

**ANSWER NO. 69:** Moderna denies that it reduced the number of sequences listed in Table II by substituting sense codons for codons in a starting coding sequence as required by claim 59. Moderna further denies that it used any method satisfying all limitations of claim 59. Moderna otherwise denies the allegations of Paragraph 69.

70. Moderna "ma[de] a structural gene that comprises a coding sequence that includes the codons substituted according to step (b) and is characterized by the reduced number of Table II polyadenylation signal sequences, and that encodes the protein." For example, upon information and belief, the Accused Products were

made using and additionally include a structural gene that comprises a coding sequence with codons that were substituted according to paragraph 69 and that encodes a SARS-CoV-2 spike protein and RSV F glycoprotein, respectively (including any subunit proteins).

**ANSWER NO. 70:** Moderna denies that it made any structural gene satisfying the limitations of claim 59. Moderna further denies that the coding sequences or DNA templates used in connection with certain accused products were made according to the process alleged in Paragraph 70. Moderna otherwise denies the allegations of Paragraph 70.

71. For purposes of additional illustration and example, Claim 60 of the ’118 Patent recites:

> The method of claim 59, wherein the starting coding sequence of step (a) contains ATTTA sequences, and wherein step (b) further comprises reducing the number of said ATTTA sequences in the coding sequence by substituting sense codons for codons in the coding sequence.

**ANSWER NO. 71:** Moderna admits that claim 60 of the ’118 Patent contains the quoted language. The ’118 Patent, including its claims, specification, and prosecution history, speaks for itself. Moderna denies Plaintiffs’ characterizations of the scope, meaning, or effect of claim 60 and otherwise denies the allegations of Paragraph 71.

72. Upon information and belief, the method performed by Moderna in making the Accused Products satisfies all elements of Claim 60 of the ’118 Patent.

**ANSWER NO. 72:** Moderna denies the allegations of Paragraph 72.

73. Moderna started with a “coding sequence ... contain[ing] ATTTA sequences.” For example, upon information and belief, the viral coding sequences for the SARS-

CoV-2 spike proteins and RSV F glycoproteins (including their respective subunit proteins) encoded by the mRNA in the accused products contained ATTTA Sequences.

**ANSWER NO. 73:** Moderna denies that it started with any of the viral coding sequences alleged in Paragraph 73. Moderna further denies that it performed any method satisfying all limitations of claim 60. Moderna otherwise denies the allegations of Paragraph 73.

74. Moderna "reduc[ed] the number of said ATTTA sequences in the coding sequence by substituting sense codons for codons in the coding sequence." For example, Moderna designed the SARS-CoV-2 spike protein and RSV F glycoprotein coding sequences for the Accused Products to have a reduced number of ATTTA sequences by substituting sense codons.

**ANSWER NO. 74:** Moderna denies that it reduced the number of ATTTA sequences by substituting sense codons for codons in a starting coding sequence as required by claim 60. Moderna further denies that it used any method satisfying all limitations of claim 60. Moderna otherwise denies the allegations of Paragraph 74.

75. For purposes of further illustration and example, Claim 73 of the '118 Patent recites:

> The method according to any one of claims 51-54, and 56-68, wherein the structural gene made according to the method contains no ATTTA sequences.

**ANSWER NO. 75:** Moderna admits that claim 73 of the '118 Patent contains the quoted language. The '118 Patent, including its claims, specification, and prosecution history, speaks for itself.

Moderna denies Plaintiffs' characterizations of the scope, meaning, or effect of claim 73 and otherwise denies the allegations of Paragraph 75.

76. Upon information and belief, the method performed by Moderna in making the Accused Products satisfies all elements of Claim 73 of the '118 Patent.

**ANSWER NO. 76:** Moderna denies the allegations of Paragraph 76.

77. Moderna "ma[de] a structural gene ... contain[ing] no ATTTA sequences." For example, upon information and belief, the Accused Products include structural genes made according to the method described in paragraphs 66-70 that contain no ATTTA sequences.

**ANSWER NO. 77:** Moderna denies that it made any structural gene according to a method satisfying all limitations of claim 73. Moderna further denies that the absence of ATTTA sequences from any accused coding sequence establishes that Moderna performed any method claimed in the '118 Patent. Moderna otherwise denies the allegations of Paragraph 77.

78. For purposes of further illustration and example, Claim 79 of the '118 Patent recites:

> The method according to any one of claims 51, 58-64, and 66, further comprising reducing the number of regions in the coding sequence(s) with greater than five consecutive adenine and thymine (A+T) nucleotides by substituting sense codons for codons in the coding sequence(s).

**ANSWER NO. 78:** Moderna admits that claim 79 of the '118 Patent contains the quoted language. The '118 Patent, including its claims, specification, and prosecution history, speaks for itself. Moderna denies Plaintiffs' characterizations of the scope, meaning, or effect of claim 79 and otherwise denies the allegations of Paragraph 78.

79. Upon information and belief, the method performed by Moderna in making the Accused Products satisfies all elements of Claim 79 of the '118 Patent.

**ANSWER NO. 79:** Moderna denies the allegations of Paragraph 79.

80. Moderna "reduc[ed] the number of regions in the coding sequence(s) with greater than five consecutive adenine and thymine (A+T) nucleotides by substituting sense codons for codons in the coding sequence(s)." For example, upon information and belief, the Accused Products made according to the methods described in paragraphs 66-70 include coding sequences with the number of regions with greater than five consecutive adenine and thymine (A+T) nucleotides reduced by substituting sense codons.

**ANSWER NO. 80:** Moderna denies that it reduced the number of regions containing more than five consecutive adenine or thymine nucleotides by substituting sense codons for codons in a starting coding sequence as required by claim 79. Moderna further denies that it performed any method satisfying all limitations of claim 79. Moderna otherwise denies the allegations of Paragraph 80.

81. Upon information and belief, Moderna has imported, used, sold, and/or offered for sale in the United States a product made by the methods of at least Claims 59, 60, 73, and 79 of the '118 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. §271(g). Upon information and belief, Moderna performs the infringing method to make the coding sequences used in and to make the Accused Products in the United States. Moderna makes, uses, offers for sale, sells, and/or imports the Accused Products.

**ANSWER NO. 81:** Moderna denies that it has infringed or continues to infringe, literally or under the doctrine of equivalents, any valid claim of the '118 Patent under 35 U.S.C. § 271(g) or otherwise. Moderna further denies that it performed any method claimed in the '118 Patent in the United States or elsewhere, or that any accused product was made by any such method. Moderna otherwise denies the allegations of Paragraph 81.

82. Plaintiffs are entitled to damages as a result of Moderna's infringement of the '118 Patent in an amount yet to be determined and adequate to compensate Plaintiffs for Moderna's infringement, but in no event less than a reasonable royalty for the use made of the patented invention by Moderna, together with interest and costs as fixed by the Court, except that Plaintiffs do not seek damages for acts of infringement, if any, covered by 28 U.S.C. § 1498.

**ANSWER NO. 82:** Paragraph 82 states legal conclusions to which no response is required. To the extent a response is required, Moderna denies that Plaintiffs are entitled to damages, a reasonable royalty, interest, costs, or any other relief from Moderna. Moderna admits that Plaintiffs state that they do not seek damages for acts of alleged infringement covered by 28 U.S.C. § 1498. Moderna otherwise denies the allegations of Paragraph 82.

## RESPONSE TO PLAINTIFFS' DEMAND FOR JURY TRIAL

Plaintiffs' demand for a jury trial does not require a response. To the extent a response is required, Moderna likewise demands a trial by jury on all issues so triable.

## ANSWER TO PLAINTIFFS' PRAYER FOR RELIEF

Plaintiffs' Prayer for Relief does not require a response. To the extent a response is required, Moderna denies that Plaintiffs are entitled to any of the relief requested in the Prayer for Relief, including subparts (1) through (5), or to any relief whatsoever.

## GENERAL DENIAL

Moderna denies each and every allegation of the Complaint not expressly admitted herein.

## AFFIRMATIVE DEFENSES

Further answering the Complaint, and without assuming the burden of proof or persuasion where such burden rests on Plaintiffs, Moderna asserts the following defenses. Moderna reserves the right to amend or supplement these defenses, and to assert additional defenses, as this action proceeds, including as its investigation continues and as Plaintiffs' infringement contentions and theories are disclosed.

## FIRST AFFIRMATIVE DEFENSE
## (NON-INFRINGEMENT OF THE '118 PATENT)

Moderna does not infringe and has not infringed, directly or indirectly, literally or under the doctrine of equivalents, any valid and enforceable claim of the '118 Patent. Among other things, the '118 Patent, titled "Synthetic Plant Genes and Method for Preparation," is directed to methods of modifying coding sequences for expression in plants, and the asserted claims require sequence-substitution steps that Moderna does not perform.

## SECOND AFFIRMATIVE DEFENSE
## (INVALIDITY OF THE '118 PATENT)

Each asserted claim of the '118 Patent is invalid for failure to satisfy one or more of the conditions and requirements of patentability set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112, and/or under any judicially created doctrine of invalidity. Among other things, to the extent any asserted claim is construed to extend beyond plant expression systems, it lacks written description and enablement support, because the '118 Patent's specification, all of its working examples, and the overwhelming majority of its 113 claims are directed exclusively to insecticidal proteins and plant expression.

**THIRD AFFIRMATIVE DEFENSE**
**(SAFE HARBOR — 35 U.S.C. § 271(e)(1))**

To the extent any of Moderna's accused activities are found to fall within the scope of any valid claim of the '118 Patent, such activities were solely for uses reasonably related to the development and submission of information to the FDA under federal law, including in connection with obtaining Emergency Use Authorization and Biologics License Approval for Moderna's COVID-19 and RSV vaccines, and are therefore exempt from infringement under the safe harbor of 35 U.S.C. § 271(e)(1).

**FOURTH AFFIRMATIVE DEFENSE**
**(28 U.S.C. § 1498(a) — GOVERNMENT AUTHORIZATION AND CONSENT)**

To the extent any accused product or activity was made, used, or sold by or for the United States Government, or with the authorization or consent of the United States Government, including pursuant to Moderna's government contracts for the development, manufacture, and supply of COVID-19 vaccine doses, Plaintiffs' exclusive remedy for any such use is a suit against the United States in the United States Court of Federal Claims under 28 U.S.C. § 1498(a), and Plaintiffs' claims against Moderna are barred to that extent.

**FIFTH AFFIRMATIVE DEFENSE**
**(PREP ACT IMMUNITY)**

To the extent applicable, Plaintiffs' claims are barred, in whole or in part, by the immunity conferred under the Public Readiness and Emergency Preparedness Act, 42 U.S.C. § 247d–6d, to the extent any accused activity relates to the administration or use of a covered countermeasure, including Spikevax®, during the COVID-19 public health emergency.

**SIXTH AFFIRMATIVE DEFENSE**
**(NO LIABILITY UNDER 35 U.S.C. § 271(g) — MATERIAL CHANGE)**

Plaintiffs' claims under 35 U.S.C. § 271(g) are barred, in whole or in part, because any product alleged to have been made by a process claimed in the '118 Patent was materially changed

by subsequent processes prior to importation, use, offer for sale, or sale in the United States, including through transcription into mRNA using chemically modified, non-natural nucleosides, and formulation into a lipid nanoparticle delivery system, and/or became a trivial and nonessential component of a subsequent product.

**SEVENTH AFFIRMATIVE DEFENSE**
**(PROSECUTION HISTORY DISCLAIMER AND ESTOPPEL)**

Plaintiffs are barred, based on statements, representations, and admissions made during prosecution of the application that issued as the '118 Patent or related applications, from asserting any interpretation of any valid claim of the '118 Patent broad enough to cover any Moderna product or process, whether literally or under the doctrine of equivalents.

**EIGHTH AFFIRMATIVE DEFENSE**
**(LIMITATION ON DAMAGES — 35 U.S.C. §§ 286, 287, 288)**

Plaintiffs' recovery of damages, if any, is limited or barred, in whole or in part, under 35 U.S.C. §§ 286, 287, and/or 288, including because Plaintiffs delayed filing suit until immediately before the six-year damages lookback period under Section 286 would otherwise have excluded a substantial portion of the alleged infringing conduct, and due to Plaintiffs' and/or their licensees' failure to mark.

**NINTH AFFIRMATIVE DEFENSE**
**(NO WILLFUL INFRINGEMENT)**

Moderna has not willfully infringed, and does not willfully infringe, any valid and enforceable claim of the '118 Patent, and Plaintiffs are not entitled to enhanced damages under 35 U.S.C. § 284.

**TENTH AFFIRMATIVE DEFENSE**
**(NO EXCEPTIONAL CASE)**

This is not an exceptional case within the meaning of 35 U.S.C. § 285, and Plaintiffs are not entitled to an award of attorneys' fees.

**ELEVENTH AFFIRMATIVE DEFENSE**
**(EQUITABLE DEFENSES — ESTOPPEL, WAIVER, AND ACQUIESCENCE)**

Plaintiffs are barred, based on statements, representations, amendments, and admissions made during prosecution of the applications resulting in the '118 Patent and related proceedings, from asserting any interpretation of the asserted claims broad enough to cover Moderna's accused processes or products, either literally or under the doctrine of equivalents. In particular, Plaintiffs may not obtain a claim scope materially broader than the plant-focused positions on which the applicants relied during prosecution to overcome objections concerning the scope of the claimed subject matter relative to the disclosure.

**TWELFTH AFFIRMATIVE DEFENSE**
**(PROSECUTION LACHES)**

Plaintiffs' claims and requested relief are also barred, in whole or in part, because the asserted claims are unenforceable under the doctrine of prosecution laches. The applications leading to the '118 Patent were subject to unreasonable and unexplained delay, including the late presentation of claims that are, as now construed by Plaintiffs, materially broader than the plant- and insecticidal-protein-focused subject matter previously pursued during prosecution and addressed in the interference proceedings. That delay caused prejudice by permitting Plaintiffs to assert late-emerging claims against technologies independently developed in a materially different field from the plant-expression systems addressed during those proceedings.

**THIRTEENTH AFFIRMATIVE DEFENSE**
**(FAILURE TO STATE A CLAIM)**

The Complaint fails to state a claim upon which relief can be granted.

**FOURTEENTH AFFIRMATIVE DEFENSE**
**(RESERVATION OF ADDITIONAL DEFENSES)**

Moderna reserves the right to assert additional defenses that become known or available through discovery or further investigation in this action, including as Plaintiffs' infringement contentions and claim construction positions are disclosed.

**JURY DEMAND**

Moderna hereby demands a trial by jury on all issues so triable, on its Counterclaims and as to Plaintiffs' Complaint.

**PRAYER FOR RELIEF ON THE COMPLAINT**

WHEREFORE, Moderna respectfully requests that the Court enter judgment in its favor and against Plaintiffs as follows:

(a) Dismissing the Complaint with prejudice and denying each and every prayer for relief contained therein;

(b) Declaring that Moderna has not infringed, and does not infringe, any valid claim of the '118 Patent;

(c) Declaring that each asserted claim of the '118 Patent is invalid;

(d) Declaring that Plaintiffs are not entitled to any damages, ongoing royalty, or other monetary or injunctive relief;

(e) Declaring this case exceptional under 35 U.S.C. § 285 and awarding Moderna its reasonable attorneys' fees, costs, and expenses incurred in defending this action; and

(f) Granting Moderna such other and further relief as the Court deems just and proper.

Dated: October 13, 2026

Respectfully submitted,

/s/ Brian E. Farnan

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
(302) 777-0301
bfarnan@farnanlaw.com

*Attorneys for Defendants Moderna, Inc., Moderna US, Inc., and ModernaTX, Inc.*

OF COUNSEL:

Daryl L. Wiesen (*pro hac vice*)
Elaine Herrmann Blais (*pro hac vice*)
Alexandra Lu (*pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
DWiesen@goodwinlaw.com
EBlais@goodwinlaw.com
ALu@goodwinlaw.com

Matthew Ginther (*pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-1000
MGinther@goodwinlaw.com

Gabriel B. Ferrante (*pro hac vice*)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
GFerrante@goodwinlaw.com